THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NAVNEET EDUCATION LTD., INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | )    Court No. 22-00132 |
| Defendant, | ) |
| and | ) |
| ASSOCIATION OF AMERICAN SCHOOL PAPER SUPPLIERS, | ) |
| Defendant-Intervenor. | ) |

## **ORDER**

Upon consideration of plaintiff's Rule 56.2 motion for judgment on the agency record; defendant's and defendant-intervenor's responses thereto; plaintiff's reply; the administrative record; and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained in all respects; and it is further

ORDERED that judgment will be entered in favor of the United States.


Dated: _____, 2023                    _____
        New York, NY                                            JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NAVNEET EDUCATION LTD., INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>ASSOCIATION OF AMERICAN )<br>SCHOOL PAPER SUPPLIERS, )<br><br>Defendant-Intervenor. ) | **PUBLIC VERSION**<br><br>Court No. 22-00132 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

BRISHAILAH BROWN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
    Enforcement and Compliance

ANTONIA R. SOARES
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044

February 1, 2023

Attorneys for the United States

## **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ..................................................................................3

    I.    Administrative Determination Under Review ..........................................................3

    II.    Issues Presented For Review ...................................................................................3

STATEMENT OF FACTS .............................................................................................................3

    I.    Initiation Of The Fourteenth Administrative Review ..............................................3

    II.    Preliminary Results ..................................................................................................5

    III.    The Parties' Case And Rebuttal Briefs ....................................................................6

    IV.    Final Results.............................................................................................................6

SUMMARY OF THE ARGUMENT ..............................................................................................7

ARGUMENT ................................................................................................................................10

    I.    Legal Standards......................................................................................................10

        A.    Standard Of Review....................................................................................10

        B.    Legal Framework .......................................................................................11

    II.    Commerce's Determination Of Navneet's Dumping Margin Is Supported By Substantial Evidence And In Accordance With Law ....................15

    III.    Commerce Provided Navneet With Notice That It Was Using Its Cost Information To Determine Surrogate Costs...........................................................22

    IV.    Navneet Failed To Exhaust Its Administrative Remedies Concerning Its Distortion Claims ..................................................................................................26

CONCLUSION.............................................................................................................................28

# **TABLE OF AUTHORITIES**

**Cases**

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ................................................................... 9

*Baley v. United States,*
    942 F.3d 1312 (Fed. Cir. 2019) ................................................................. 25

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ...................................................................................... 9

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ...................................................................................... 9

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007) ................................................................. 25

*Downhole Pipe & Equipment, L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015) .............................................................. 9, 24

*Fagersta Stainless AB v. United States,*
    577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ...................................... 11, 12

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) .................................................................. 8, 10

*JBF Rak LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ......................................................... 9, 25, 26

*JBF Rak LLC v. United States,*
    961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) ..................................... 11, 26

*JTEKT Corp. v. United States,*
    37 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ............................................. 10

*Koto Seiko Co., Ltd. v. United States,*
    66 F.3d 1204 (Fed. Cir. 1995) .................................................................... 11

*Koyo Seiko Co., Ltd. v. United States,*
    516 F. Supp. 2d 1323 (Ct Int'l Trade 2007) ...................................... 21, 22

*McCarthy v. Madigan,*
    503 U.S. 140 (1992) ...................................................................................... 26

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016) ....................................................................... 25

*NSK Corp. v. U.S. Int'l Trade Comm.*,
   716 F.3d 1352 (Fed. Cir. 2013) ......................................................................... 9

*NSK Ltd. v. United States*,
   217 F. Supp 2d 1291 (Ct. Int'l Trade 2002) .................................................... 10

*Pesquera Mares Australes Ltda. v. United States*,
   266 F.3d 1372 (Fed Cir. 2001) .................................................................... 10, 11

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014) ..................................................................... 9, 23

*SeAH Steel Corp. v. United States*,
   704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ................................................... 21

*Shikoku Chemicals Corp. v. United States*
   795 F. Supp. 417, 419-22 (Ct. Int'l Trade 1992) ........................................ 22, 23

*SKF USA, Inc. v. United States*,
   537 F.3d 1373 (Fed. Cir. 2008) ....................................................................... 11

*SolarWorld Americas, Inc. v. United States*,
   910 F.3d 1216 (Fed. Cir. 2018) ..................................................................... 9, 24

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996) ........................................................................... 9

*Union Steel v. United States*,
   823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) .................................................... 11

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ........................................................................................... 8

*United States v. Great Am. Ins. Co. of New York*,
   738 F.3d 1320 (Fed. Cir. 2013) ....................................................................... 25

**Statutes**

19 U.S.C. § 1677(16) ............................................................................... 10, 11

19 U.S.C. § 1677a ................................................................................... 10, 11

19 U.S.C. § 1677b(a) .................................................................................... 10

28 U.S.C. § 2637(d) ...................................................................................... 25

**Regulations**

19 C.F.R. § 351.408(c)(4) ........................................................................... 19, 20

19 C.F.R. § 351.411(a)-(b) ................................................................................ 11

**Other Authorities**

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*,
    86 Fed. Reg. 15,645 (Dep't of Commerce March 18, 2021) ..................................... 12

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*,
    70 Fed. Reg. 12,443 (Dep't of Commerce March 14, 2005) ..................................... 13

*Certain Lined Paper Products from India*,
    71 Fed. Reg. 56,949 (Dep't of Commerce Sept. 28, 2006) ...................................... 2

*Certain Lined Paper Products from India*, 8
    86 Fed. Reg. 54,426 (Dep't of Commerce Oct. 1, 2021) ......................................... 4

*Certain Oil Country Tubular Goods from the Republic of Korea*,
    87 Fed. Reg. 20,815 (Dep't of Commerce April 1, 2022), ...................................... 12

*Certain Stilbenic Optical Brightening Agents from Taiwan*,
    80 Fed. Reg. 61,368 (Dep't of Commerce Oct. 13, 2015) ....................................... 12

*Lined Paper Products From India*,,
    87 Fed. Reg. 17,989 (Dep't of Commerce March 29, 2022) ..................................... 14

*Ripe Olives from Spain*,
    86 Fed. Reg. 35,068 (Dep't of Commerce July 1, 2021) ......................................... 14

*Stainless Steel Sheet and Strip in Coils from Mexico*,
    76 Fed. Reg. 2,332 (Dep't of Commerce Jan. 13, 2011) ......................................... 13

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NAVNEET EDUCATION LTD., INC.,   ) | |
|        ) | |
|     Plaintiff,   ) | |
|        ) | |
|   v.   ) | **PUBLIC VERSION** |
|        ) | |
| UNITED STATES,   ) | Court No. 22-00132 |
|        ) | |
|        ) | |
|     Defendant,   ) | |
|        ) | |
|   and   ) | |
|        ) | |
| ASSOCIATION OF AMERICAN   ) | |
| SCHOOL PAPER SUPPLIERS,   ) | |
|        ) | |
|     Defendant-Intervenor.   ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56. 2 of the Rules of this Court, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, Navneet Education Limited, Inc. (Navneet) (Pl. Br.) (ECF No. 23).  Navneet challenges certain aspects of the Department of Commerce's (Commerce) Final Results in the fourteenth administrative review of the antidumping duty order on certain lined paper products from India.  As we demonstrate below, the Court should deny Navneet's motion because the final results are supported by substantial evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is the Final Results in the fourteenth administrative review of the antidumping duty order on certain lined paper products from India. *See Certain Lined Paper Products From India*, 87 Fed. Reg. 17,989 (Dep't of Commerce Mar. 29, 2022) (Final Results) (Appx12542-12544), and the accompanying IDM (Appx12529-12541). The period of review is September 1, 2019, through August 31, 2020.

### II.    Issues Presented For Review

1.    Whether substantial evidence supports Commerce's use of third-country control numbers (or CONNUMs) to determine surrogate costs.

2.    Whether Commerce deprived Navneet of notice of a purported change in methodology related to its use of third-country CONNUMs to determine surrogate costs.

3.    Whether Navneet failed to exhaust its administrative remedies when it raised only vague and undeveloped distortion claims before Commerce and now raises highly-technical and fact-specific distortion claims before this Court.

## STATEMENT OF FACTS

### I.    Initiation Of The Fourteenth Administrative Review

On September 28, 2006, Commerce published the antidumping and countervailing duty orders covering the subject merchandise. *See Certain Lined Paper Products from India*, 71 Fed. Reg. 56,949 (Dep't of Commerce Sept. 28, 2006) (notice of antidumping and countervailing duty orders) (orders). In October 2020, Commerce initiated the subject review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 68,840 (Dep't of Commerce Oct. 30, 2020). On January 13, 2021, Commerce selected Navneet and Super Impex

3

as the mandatory respondents for this administrative review.  PDM at 2 (Appx12358).  Navneet

and Super Impex were among the companies who self-requested administrative review.  *Id.*  On

January 19, 2021, Super Impex withdrew its request for review.  *Id.*  Thereafter, petitioners

requested that Commerce select an additional mandatory respondent in place of Super Impex.

*Id.* at 3 (Appx12359).  After considering the petitioners' request, Commerce decided to continue

with Navneet as the sole mandatory respondent because, among other reasons, Navneet made up

a majority of the total imports of the six firms subject to this review.  *Id.*[1]

On February 10, 2021, Navneet submitted its response to section A of Commerce's initial

questionnaire and, on March 8, 2021, submitted its response to sections B, C, and D of the initial

questionnaire.  *See* Navneet's Section A Questionnaire Response (Appx80186-80689,

Appx10978-11403); Navneet's Section B, C, and D Questionnaire Responses (Appx80690-

81346, Appx11416-11931).

In its section D questionnaire response, Navneet reported costs in its cost database for all

subject product CONNUMs that were sold in the home market, the United States, and third

countries.  *See* Navneet's Section D Questionnaire Response (Appx80853-80856, Appx81317-

81321).  Navneet's cost database contained 174 CONNUMs, and of these, Navneet sold 88

CONNUMs in the United States or the home market, and Navneet sold 86 CONNUMs only in

third countries.  Appx81317-81321.  Navneet also reported that nine of the CONNUMs included

in the home market database were sold in the home market during the period of review but were

---

[1] *See YC Rubber Co. (North America) LLC v. United States*, Nos. 2021-1489, 2021-
1698, 2021-1699, 2021-1700, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29, 2022)
("conclud{ing} that a 'reasonable number' {of exporters or producers} is generally more than
one").

not produced during the period of review.  *Id*.  In its cost database accompanying its section D questionnaire response, Navneet provided a surrogate CONNUM and the costs associated with the surrogate CONNUM for each of the nine CONNUMs sold but not produced during the period of review, three of which were sold only in third countries.  *Id*.

## II.   **Preliminary Results**

On September 27, 2021, Commerce published the Preliminary Results.  *See Certain Lined Paper Products from India*, 86 Fed. Reg. 54,426 (Dep't of Commerce Oct. 1, 2021) (Preliminary Results) (Appx12381-12384), and accompanying Preliminary Decision Memorandum (PDM) (Appx12357-12380).  Commerce preliminarily determined that Navneet made sales of the subject merchandise at less than normal value during the period of review.

For the Preliminary Results, Commerce applied its model matching hierarchy to choose the most similar product produced during the period of review to determine surrogate costs. PDM at 16-17, 22-23 (Appx12372-12373, Appx12378-12379).  In conducting its margin analysis, Commerce extracted physical characteristics from the CONNUMs in Navneet's cost data because that data included all CONNUMs sold in the U.S. and home markets, and certain CONNUMs sold in third countries and, thus, that cost data constituted the most comprehensive pool of CONNUMs.  Appx12537.  Navneet provided cost data for certain CONNUMs that were produced during the period of review and sold only in countries other than the U.S. and the home market.  *Id*.  Commerce observed that this information was on the record of this administrative review, and found no reason to exclude some or all these cost records from the pool of potential surrogate costs.  *Id*.

5

**III.**  **The Parties' Case And Rebuttal Briefs**

After publishing the Preliminary Results on October 1, 2021, Commerce invited the

parties to comment on the Preliminary Results, and extended the briefing schedule on October 27

and November 10, 2021.  Final Results at 2 (Appx12530).  On November 8, 2021, Navneet

submitted its case brief and, on November 22, 2021, submitted its rebuttal brief.  *See* Navneet's

Case Br. (Appx12413-12444); Navneet's Rebuttal Br. (Appx82628-82635).

In its November 8, 2021 case brief, Navneet contended that Commerce departed from its

standard dumping methodology when it included costs for products sold only in third countries

in the cost analysis instead of limiting the cost database to only those products — defined by

product matching CONNUMs — that were sold in the United States or in the home market.

Navneet Case Br. (Appx12413-12444).

**IV.**  **Final Results**

In its Final Results, consistent with its practice, Commerce continued to rely on its model

matching methodology to find the most similar CONNUMs to determine surrogate costs for all

of Navneet's sales, including the CONNUMs sold but not produced during the period of review.

*See* Final Results at 8-9 (Appx12536-12537).

Commerce explained that, because cost of production information was unavailable for the

products that Navneet sold but did not produce during the period of review, it determined the

surrogate costs for such products by selecting a similar product based on the hierarchy of product

characteristics established in the CONNUM.  *Id.* at 8 (Appx12536).  Commerce further

explained that its preference in assigning surrogate costs is to select the most similar product

from a pool of all available CONNUMs with cost information on the record as long as such

surrogate costs do not lead to distortions.  *Id.*

Commerce further explained that its dumping calculation program requires physical characteristics to identify surrogate CONNUMs through model matching. *Id.* at 9 (Appx12537). These physical characteristics can come from either the respondent's cost data or sales data. *Id.* In Navneet's margin analysis for the Preliminary Results, Commerce extracted physical characteristics from the CONNUMs in the cost data because it was the most comprehensive pool of CONNUMs; the cost data included all CONNUMs sold in the U.S. and home markets, and certain CONNUMs sold in third countries. *Id.* Navneet also provided cost data for certain CONNUMs that were produced during the period of review and sold only in countries other than the U.S. and the home market. *Id.* Because this information was on the record of the administrative review, Commerce found no reason to exclude these cost records from the pool of potential surrogate costs. *Id.*

Commerce further explained that the selection of surrogate costs through model matching in Commerce's dumping calculations identified certain of these CONNUMs that were sold only in third countries to be the most similar products to the CONNUMs that were sold but not produced during the period of review. *Id.* Commerce found that including these third-country CONNUMs as surrogate costs was not distortive because the cost components of these third-country CONNUMs — such as direct materials, labor, fixed and variable overhead, and packing — were within the range of the cost components of the CONNUMs that were sold in the U.S. and home markets, indicating that the third-country CONNUMs have a similar cost structure as the CONNUMs sold in the U.S and home markets. *Id.*

## SUMMARY OF THE ARGUMENT

The Court should deny Navneet's Rule 56.2 motion because Commerce's Final Results are supported by substantial evidence and in accordance with law. Commerce followed its

model matching hierarchy to choose the most similar product produced during the period of review to determine surrogate costs for products sold but not produced during the period of review. Commerce found that the selected surrogate costs did not distort Navneet's margin because they were within the cost range of products sold in the United States and home markets. Thus, Commerce's selection of surrogate costs using its model matching methodology and the resulting margin are supported by substantial evidence and are otherwise in accordance with law.

Navneet raises three key challenges to Commerce's calculation of its dumping margin in the Final Results, all of which lack merit. First, Navneet erroneously contends that Commerce departed from its established practice by using the cost of CONNUMs sold only in third countries as surrogate costs for purposes of the DIFMER test. Commerce did not depart from its practice. As Commerce explained, its practice in assigning surrogate costs is to use the most similar product from a pool *of all available CONNUMs* with cost information on the record as long as it does not lead to distortions.

Second, Navneet erroneously contends that Commerce's purported practice of not using third country CONNUM costs has been recently affirmed in *Ripe Olives from Spain*, 86 Fed. Reg. 35,068 (Dep't of Commerce July 1, 2021), and accompanying IDM at Cmt. 9). Navneet misreads that decision. In that case, Commerce not only adjusted the database to comport with its practice of selecting the most similar products available to establish surrogate costs, Commerce also relied on third country costs in doing so.

Third, Navneet contends that Commerce's purported practice of not using third country CONNUM costs is reflected in Commerce's public standard margin calculation program, and that Commerce impermissibly altered that program to include Navneet's third country CONNUM costs. But Commerce's decision in *Stainless Steel Sheet and Strip in Coils from*

8

*Mexico* establishes that Commerce's adjustment to the calculation program is often necessitated because respondents often fail to properly report product-characteristic information as Navneet did here.  76 Fed. Reg. 2,332 (Dep't of Commerce Jan. 13, 2011), and accompanying IDM at Cmt. 1).

Navneet also contends that Commerce "changed its methodology" without providing Navneet with notice and a reasonable explanation for its departure from established practice.  As discussed above, Commerce's use of third-country CONNUM costs constitutes neither a change in methodology nor a departure from established practice.  But even if Commerce's use of third-country CONNUMs constituted a change in methodology, which it did not, Commerce was only obligated to provide Navneet with an opportunity to comment prior to its final determination in this matter.  Because Navneet had an opportunity to comment, its lack-of-notice claim fails.

Finally, Navneet raises highly-technical and fact-specific distortion claims in this Court, but failed to exhaust its administrative remedies related to those claims.  Those technical and fact-specific arguments do not appear in its briefing before Commerce.  Rather, in those briefs, Navneet raised nothing more than undeveloped and vague arguments concerning distortion.  In this case, however, it raises distortion claims based on Commerce's application of the DIFMER test and its model matching methodology.  Because Navneet failed to raise these claims before Commerce, the agency was not afforded an opportunity to address those arguments on the record.  In failing to raise these arguments before Commerce, Navneet has also impeded judicial review; this Court has no record of the agency's consideration and resolution of these issues. Because Navneet failed to exhaust its administrative remedies concerning its distortion claims, the Court should deem these arguments waived.  *See, e.g.*, *JBF Rak LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) ("Because {plaintiff-appellant} failed to raise these issues

before Commerce, the {Court of International Trade} correctly found it had not exhausted its administrative remedies.").

## ARGUMENT

## I.   Legal Standards

### A.   Standard Of Review

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 315 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence.").

Substantial evidence is "more than a mere scintilla" of relevant evidence. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). But it is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion{.}" *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotations and citations omitted). The Court's "review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusion." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) (citations omitted).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). This Court does not "reweigh the evidence already considered by Commerce{.}" *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (citing

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015));

*accord NSK Corp. v. U.S. Int'l Trade Comm.*, 716 F.3d 1352, 1366 (Fed. Cir. 2013)).

This Court affords Commerce an especially great deal of deference "when a statute fails

to make clear 'any Congressionally mandated procedure or methodology for assessment of the

statutory tests." *JBF Rak LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting

*U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).  In that circumstance,

"Commerce 'may perform its duties in the way it believes most suitable." *Id*. (quoting *U.S. Steel*

*Grp*., 96 F.3d at 1362).  As a result, Commerce receives "tremendous deference" that is "both

greater than and distinct from that accorded the agency in interpreting the statutes it administers"

when it exercises its technical expertise to select and apply methodologies to implement the

dictates of the trade statute.  *Fujitsu General Ltd., v. United States*, 88 F.3d 1034, 1039 (Fed. Cir.

1996).

B.    <u>**Legal Framework**</u>

To determine whether subject merchandise is being sold in the United States at less than

fair value, Commerce compares the price at which the merchandise is sold in the United States

(the export price) with the price of the product in the home market (the normal value).  *See* 19

U.S.C. § 1677b(a); 19 U.S.C. § 1677a(a); 19 U.S.C. § 1677(a)(1)(A)-(B).  The dumping margin

is the amount by which the normal value exceeds the export price.  *See Id.* § 1677(35)(A).  After

an affirmative antidumping determination, duties are assessed on subject merchandise in the

amount of the dumping margin.  *See Id.* § 1673(2)(B).

To calculate the dumping margin, Commerce must identify the foreign like product that

will be compared with the subject merchandise sold in the United States.  *Pesquera Mares*

*Australes Ltda. v. United States*, 266 F.3d 1372, 1375 (Fed Cir. 2001).  Foreign like product is

11

statutorily defined according to a hierarchy of characteristics.  *See* 19 U.S.C. § 1677(16).  The

Tariff Act of 1930, as amended, establishes a hierarchy for identifying the foreign like product

under which Commerce first tries to match subject merchandise sold in the United States with

identical products sold in the home market.  *JTEKT Corp. v. United States*, 37 F. Supp. 3d 1326,

1334 (Ct. Int'l Trade 2014); *NSK Ltd. v. United States*, 217 F. Supp 2d 1291,1299-1300 (Ct. Int'l

Trade 2002).  If it is not possible to identify identical merchandise, Commerce matches subject

merchandise with similar products sold in the home market.  *JTEKT Corp.*, 37 F. Supp. 3d at

1334.

   "Identical" products do not have to share exactly the same physical characteristics.

*Pesquera Mares*, 266 F.3d at 1383.  Rather, "merchandise should be considered to be identical

despite the existence of minor differences in physical characteristics, if those minor differences

are not commercially significant."  *Id*. at 1384.  Commerce determines what constitutes

"commercially significant" physical differences on a case-by-case basis.  *Fagersta Stainless AB

v. United States*, 577 F. Supp. 2d 1270, 1279 (Ct. Int'l Trade 2008).

   "Congress has granted Commerce considerable discretion to fashion the methodology

used to determine what constitutes 'foreign like product' under the statute."  *SKF USA, Inc. v.

United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (citation omitted).  Accordingly,

"Commerce has 'considerable discretion' to construct a methodology for identifying the 'foreign

like product' in antidumping proceedings."  *Fagersta*, 577 F. Supp. 2d at 1275-76.

   Commerce has developed a model-match methodology to identify the foreign like

product.  The model-match methodology is based on a hierarchy of commercially significant

product characteristics that Commerce uses to create control numbers or CONNUMs, which

identify unique products for comparison.  *See* 19 U.S.C. § 1677(16)(A); *see also JBF Rak LLC v.*

12

*United States*, 961 F. Supp. 2d 1274, 1283-84 (Ct. Int'l Trade); *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1349 (Ct. Int'l Trade 2012). The Court of Appeals for the Federal Circuit has held that *Chevron* deference applies to that methodology. *See Koto Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995); *Pesquera Mares*, 266 F.3d at 1379-1384.

When the products being sold in the United States and home market are not identical, Commerce makes a difference-in-merchandise (DIFMER) adjustment to account for cost variations arising from physical differences between products sold in different countries. *See Fagersta*, 577 F. Supp. 2d at 1281 (citing 19 U.S.C. § 1677(a)(6)(C)(ii); 19 C.F.R. § 351.411(a)-(b)). The DIFMER adjustment enables an apples-to apples comparison between the two products. *Id.* A DIFMER calculation of greater than 20 percent creates a "presumption of incomparability," but does not absolutely preclude Commerce from comparing those products. *Id*.

When a respondent has a product that was sold but not produced during the period of review, Commerce's practice in assigning surrogate costs is to select the most similar product from a pool of all available CONNUMs with cost information on the record as long as such surrogate costs do not lead to distortions. *See Certain Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg. 20,815 (Dep't of Commerce April 1, 2022), and accompanying IDM at Cmt. 14 ("Commerce's practice in assigning surrogate costs for products sold but not produced during the {period of review} is to choose the most similar product produced during the {period of review}, as long as it does not lead to distortions.") (citing *Certain Frozen Warmwater Shrimp from Thailand*, 82 Fed. Reg. 30,836 (Dep't of Commerce July 3, 2017), and accompanying IDM at Cmt. 3 (continuing to use respondent's company-specific cost databases for the final results because, "{i}n this case, {respondent} provided company-specific cost data

which included costs for all products produced during the {period of review}, regardless of the market in which the product was subsequently sold.")); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*, 86 Fed. Reg. 15,645 (Dep't of Commerce March 18, 2021), and accompanying IDM at Cmt. 3 (explaining that "Commerce's practice to rely on the reported costs of a similar product in instances where a respondent did not manufacture a product during the reporting period{,}" and "continu{ing} to rely upon the product characteristics reported in {respondent's} {cost of production} database to assign the cost for the closest matching CONNUM"); *Certain Stilbenic Optical Brightening Agents from Taiwan*, 80 Fed. Reg. 61,368 (Dep't of Commerce Oct. 13, 2015), and accompanying IDM at Cmt. 2 ("It is the Department's practice to rely on the reported costs of a similar product in instances where a respondent did not manufacture a product during the reporting period."); *Stainless Steel Sheet and Strip in Coils from Mexico*, 76 Fed. Reg. 2,332 (Dep't of Commerce Jan. 13, 2011), and accompanying IDM at Cmt. 1) (*SSSSC from Mexico*) ("{Commerce's} preference in calculating costs and assigning surrogate costs (where appropriate) is to use the most similar product available in establishing those surrogates as long as it does not lead to distortions" because doing so "establishes a pool of similar merchandise for surrogate selection based on the reported product characteristics conforming to {Commerce's} product hierarchy."); *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 70 Fed. Reg. 12,443 (Dep't of Commerce March 14, 2005) (*CORE from Korea 2002-03*), and accompanying IDM at Cmt. 1 (continuing to apply respondent's methodology for reporting costs because it "applied a consistent methodology based on the physical characteristics of the merchandise to select the surrogate cost for products that were sold but not produced during the {period of review}").

14

Although using the costs of the most similar CONNUM is Commerce's preference, in each instance, it analyzes whether the cost of the most similar CONNUM reasonably reflects the cost of the CONNUM not produced during the period of review.  Commerce's practice is to find that U.S. prices can be reasonably compared if the difference in the variable cost of manufacturing of the merchandise being compared is within 20 percent of the total cost of merchandise sold in the United States (DIFMER).  *See* Import Administration Policy Bulletin, No. 92.2 (Dep't of Commerce 1992).  This prevents the comparison of U.S. products to comparison markets that are too dissimilar to render a meaningful comparison.  *Id.*  If the physical difference between the sold CONNUM and the surrogate CONNUM is so significant that using the surrogate CONNUM causes a distortion in the calculation of normal value, Commerce does not use the surrogate CONNUM.  *Id.*

## II.    Commerce's Determination Of Navneet's Dumping Margin Is Supported By Substantial Evidence And In Accordance With Law

Navneet raises three key challenges to Commerce's calculation of its dumping margin in the Final Results:  (1) that Commerce engaged in an arbitrary departure from its established practice by using the cost of CONNUMs sold only in third countries as surrogate costs for purposes of the DIFMER test (Pl. Br. at 18-19); (2) that Commerce's practice of not using third country CONNUM costs has been recently affirmed in *Ripe Olives from Spain*, 86 Fed. Reg. 35,068 (Dep't of Commerce July 1, 2021), and accompanying IDM at Cmt. 9) (Pl. Br. at 21-22); and (3) that Commerce's practice of not using third country CONNUM costs is reflected in Commerce's public standard margin calculation program, which Commerce impermissibly altered to include the third country CONNUM costs (*id.* at 19-20, 22, 23-24).  Navneet's arguments are without merit.

15

Related to Navneet's first key argument — that Commerce departed from its established practice by using the cost of CONNUMs sold only in third countries as surrogate costs for purposes of the DIFMER test (Pl. Br. at 18-19), this argument misstates Commerce's practice. Commerce's use of third-country CONNUMs is consistent with its practice. As explained in the Final Results, Commerce's preference in assigning surrogate costs is to use the most similar product from a pool of all available CONNUMs with cost information on the record as long as it does not lead to distortions. Final Results at 8 (citing, among other cases, *CORE from Korea 2002-03* IDM at Cmt. 5; *SSSSC from Mexico 2008-09* IDM at Cmt. 1) (Appx12536).

Contrary to Navneet's assertions, Commerce is not confined to U.S. and home country markets' CONNUMs when determining surrogate costs. In its 2017 decision in *Certain Frozen Warmwater Shrimp from Thailand*, Commerce continued to use respondent's company-specific cost databases for the final results because respondent "provided company-specific cost data which included costs for all products produced during the {period of review}, *regardless of the market in which the product was subsequently sold*." 82 Fed. Reg. 30,836 (Dep't of Commerce July 3, 2017), and accompanying IDM at Cmt. 3 (emphasis added). In fact, Commerce's Section D Questionnaire Instructions require respondents to assign CONNUM costs "*regardless of the market or markets in which the product(s) were sold*{.}" *See* Navneet's Section D Responses at D-2 (Appx80817) (emphasis added)

Navneet's second key argument — that Commerce's purported practice of not using third country CONNUM costs has been recently affirmed in *Ripe Olives from Spain* — is based on a misreading of that decision. *See* Pl. Br. at 21-22. Nothing in that decision is inconsistent with the Final Results. Navneet interprets *Ripe Olives from Spain* to confine Commerce's selection of surrogate costs to only those CONNUMs sold in either the U.S. or home comparison markets,

16

and that CONNUMs sold only in third-country markets were "appropriately excluded" from use as surrogate costs for purposes of the DIFMER test.  Pl. Br. at 21.  But the "appropriately excluded" language upon which Navneet relies was not taken from the decision's consideration of third-country markets.  In fact, in *Ripe Olives from Spain*, "Commerce relied on partial facts available to adjust {the respondent's} reported CONNUM-specific costs to *include* the {cost of merchandise} of identical products sold by {the respondent} *in third countries*."  IDM at Cmt. 5 (emphasis added).  For the final results in *Ripe Olives from Spain*, Commerce "continue{d} to adjust {the respondent's} reported cost database *to include the costs of the identical products sold in countries other than the home market or the United States* or as we did in the {preliminary results}."  *Id.* (emphasis added).  In *Ripe Olives from Spain*, Commerce not only adjusted the database to comport with its practice of selecting the most similar products available to establish surrogate costs, Commerce also relied on third-country costs in doing so.  *Id.*  Thus, *Ripe Olives from Spain* is consistent with Commerce's practice.  *See, e.g.*, *Certain Frozen Warmwater Shrimp from Thailand* IDM at Cmt. 3 (continuing to use respondent's company-specific cost databases for the final results because respondent "provided company-specific cost data which included costs for all products produced during the {period of review}, *regardless of the market in which the product was subsequently sold*") (emphasis added).

Also without merit is Navneet's third key argument — that Commerce's purported practice of not using third country CONNUM costs is reflected in Commerce's public standard margin calculation program, and that Commerce impermissibly altered that program to include Navneet's third country CONNUM costs.  *See* Pl. Br. at 19-20, 22, 23-24.  In particular, Navneet contends that Commerce's use of the third country CONNUM costs to assign surrogate costs was impermissible because Commerce's standard margin-calculation program does not use costs for

17

CONNUMs sold only in third-countries as surrogate costs when, as here, a respondent does not report product physical characteristics in its cost database as in this case.  Pl. Br. at 18-24. Navneet contends that by changing its reported "NO" to a "YES" in response to the program's question — "Are the product physical characteristic variables in the cost database?" — Commerce created an "error of fact" because Navneet's "NO" response confined Commerce to CONNUMs sold in the home and U.S. markets during the period of review, and precluded Commerce from using third country data.  *Id.*  Navneet provides no support for its assertions, and there is none.

In the Final Results, Commerce explained that, because cost of production information was unavailable for the products that Navneet sold but did not produce during the period of review, it determined the surrogate costs for such products by selecting a similar product based on the hierarchy of product characteristics established in the CONNUM.  Final Results at 8 (Appx12536).  Commerce further explained that its preference in assigning surrogate costs is to select the most similar product from a pool of all available CONNUMs with cost information on the record as long as such surrogate costs do not lead to distortions.  *Id.* (citing, among other cases, *CORE from Korea 2002-03* IDM at Cmt. 5; *SSSSC from Mexico 2008-09* IDM at Cmt. 1). Commerce's dumping calculation program requires physical characteristics to identify surrogate CONNUMs by way of model matching.  *Id.* at 9 (Appx12537).  Commerce extracted physical characteristics from the CONNUMs in Navneet's cost data because that data was the most comprehensive pool of CONNUMs; the cost data included all CONNUMs sold in the U.S. and home markets, and certain CONNUMs sold in third countries.  *Id.*  Commerce also found that Navneet provided cost data for certain CONNUMs that were produced during the period of review and sold only in third countries, and that there was "no reason to exclude some or all

18

these cost records from the pool of potential surrogate costs." *Id.* Commerce further found that the selection of surrogate costs through model matching in Commerce's dumping calculations program identified certain of these CONNUMs that were sold only in third countries to be the most similar products to the CONNUMs that were sold but not produced during the period of review. *Id.* (citing Navneet Prelim. Calc. Mem. at Attach. 3 at 24-26) (Appx82119-82126, Appx12385-12393)).

The administrative record shows that, because Navneet did not report product characteristics, Commerce created variables for each of the eight physical characteristics in the CONNUMs in the cost database. *See* Prelim. Calc. Mem. at 3 (Appx82121, Appx12387). These product characteristic variables were needed in the cost database for the margin analysis to find surrogate costs for the CONNUMs that were sold but not produced during the period of review. *Id*. This modification was necessary to accommodate the physical characteristics that Commerce added to the cost database in the home market. *Id*. at 5 (Appx82123). As a result of this adjustment, the "&LET COST_PROD_CHARS" field is set to "YES." Appx82147, Appx82709. This was not an error as Navneet claims, but a necessary modification to Commerce's program to provide the required product characteristics for CONNUMs included in Navneet's cost database.

In support of its practice of using all cost CONNUMs reported in a respondent's cost database to determine surrogate costs, Commerce relied on two of its previous decisions. Final Results at 8 (Appx12536). Commerce relied on *SSSSC from Mexico* in which Commerce concluded that the exclusion of cost CONNUMs from the surrogate cost pool is contrary to its "preference in calculating costs and assigning surrogate costs," which is to "use the most similar product available in establishing those surrogates as long as it does not lead to distortions." IDM

19

Cmt. 1.  Thus, in *SSSSC from Mexico*, Commerce took the steps needed to ensure that its standard programming executed as intended to include all cost CONNUMs in the surrogate cost analysis.  In this case, Commerce's modification was consistent with that practice.  Commerce also relied on *CORE from Korea 2002-03*, in which it "applied a consistent methodology based on the physical characteristics of the merchandise to select the surrogate cost for products that were sold but not produced during the {period of review}."  IDM at Cmt. 5.  Thus, Navneet misinterprets these decisions when contending that they are inapposite because they do not contain any specific statement about CONNUMs sold only in third-country markets.  Pl. Br. at 28 (citing Final Results at 8 (Appx12536)).

That Navneet did not report product physical characteristics in its cost database did not somehow preclude Commerce from adjusting Navneet's responses to capture that information given that the dumping calculation program requires physical characteristics to identify surrogate CONNUMs.  Final Results at 9 (Appx12537).  The margin analysis program relies on the hierarchy of product characteristics to identify CONNUMs in the cost database that were the most similar to the CONNUMs that were sold but not produced during the period of review.  *Id.* at 9 n.28 (Appx12537).  Thus, the product characteristics are used by the program to determine the appropriate costs to use.  *Id*. at 9 (Appx12537).  As Navneet concedes, the physical characteristics can come from either the respondent's cost data or sales data.  Pl. Br. at 22.  In fact, Commerce's adjustment to the calculation program is often necessitated because respondents often fail to properly report product-characteristic information.  In *SSSC from Mexico*, Commerce was required to revise its comparison market program to account for respondent's exclusion of the total universe of CONNUMs produced during the period of review.  IDM Cmt. 1.  There, Commerce explained that, "{i}n our experience, respondents generally only

report in the {cost of production/constructed value} file the per-unit cost, on a CONNUM-specific basis, and do not include the separate product characteristics fields used to derive the overall CONNUM." *Id.*  Because respondents report product characteristics in the sales file, "the cost database is merged with the sales databases to attach the product characteristics to the CONNUMs reported in the cost database." *Id.*  Commerce further explained that, "{w}here there is a sale without production for a particular CONNUM, the program will look to the respondent's reported {period of review} costs (if provided) to obtain a cost for that particular CONNUM that was sold but not produced." *Id.*  The program uses the product characteristics to determine the appropriate cost to use.  *Id.*  Thus, Commerce's adjustment to the program was not only required, but a typical response to a respondent's failure to properly report product characteristics.  The adjustment Commerce made in *SSSC from Mexico* is precisely the adjustment Commerce made here.  *See* Prelim. Calc. Mem. at 3 (Appx82121, Appx12387); *id.* at 5 (Appx82123, Appx12389).

Navneet's remaining arguments are also without merit.  Navneet contends that Commerce impermissibly relied on 19 C.F.R. § 351.408(c)(4) to support its use of all available CONNUMs with cost information on the record because the regulation relates only to non-market economy country margin calculations.  Pl. Br. at 21.  We agree that Commerce cited 19 C.F.R. § 351.408(c)(4) in error, but it is clear from the citations that follow that sentence that Commerce was relying on decisions setting forth its practice of using the CONNUMs on the record.  *See* Final Results at 8 (citing, among other cases, *CORE from Korea 2002-03* IDM at Cmt. 5; *SSSSC from Mexico 2008-09* IDM at Cmt. 1) (Appx12536).

Finally, Navneet challenges Commerce's statement in the Final Results "that Navneet argues that certain CONNUMs in its costs database that were produced and sold only in third

countries are the best surrogate cost for certain CONNUMs that Navneet sold in the U.S. and/or

home market but did not produce during the {period of review}." Pl. Br. at 22-23 (quoting Final

Results at 9 (Appx12537) (citing Navneet BCDQR at Exhibit D-25) (Appx81316-81321)). We

agree that Navneet did not explicitly make that statement. But Commerce did make a finding

that "Navneet provided cost data for certain CONNUMs that were produced during the {period

of review} and sold only in countries other than the U.S. and the home market{,}" and that,

because "{t}his information is on the record of this administrative review," there was "no reason

to exclude some or all these cost records from the pool of potential surrogate costs." Final

Results at 9 (Appx12537). Although Navneet would have Commerce disregard this information

as "meaningless placeholder CONNUMs" (*see* Pl. Br. at 23 (citing Navneet BCDQR at D-38 to

D-41, Ex. D-25, Appx80853-80856, Appx81317-81320)), pursuant to its practice, Commerce

was required to consider these CONNUMs from Navneet's cost data given that Commerce's

dumping calculation program requires physical characteristics to identify surrogate CONNUMs

by way of model matching. Final Results at 9 (Appx12537).

   Because Commerce's use of third-country CONNUM costs to determine surrogate costs

is based on its practice and supported by substantial evidence, Navneet's challenges fail.

## III.   Commerce Provided Navneet With Notice That It Was Using Its Cost Information To Determine Surrogate Costs

   Navneet contends that Commerce "changed its methodology" without providing Navneet

with notice and a reasonable explanation for its departure from established practice. Pl. Br. at

22, 24-28. Navneet misstates the record.

   As discussed above, Commerce's use of third-country CONNUMs constitutes neither a

change in methodology nor a departure from established practice. Consistent with its practice,

Commerce determined surrogate costs by selecting the most similar product from a pool of all

22

available CONNUMs with cost information on the record after determining that such surrogate

costs did not lead to distortions.  Final Results at 8 (citing *CORE from Korea 2002-03*) IDM at

Cmt. 1 and *SSSSC from Mexico* IDM at Cmt. 1) (Appx12536).  Although insisting that

Commerce's practice is confined to U.S. and home markets' CONNUMs, Commerce's practice

is to consider all CONNUMs on the record, including third-country CONNUMs.  *See Certain*

*Frozen Warmwater Shrimp from Thailand* IDM at Cmt. 3 (continuing to use respondent's

company-specific cost databases for the final results because respondent "provided company-

specific cost data which included costs for all products produced during the {period of review},

*regardless of the market in which the product was subsequently sold*") (emphasis added).

But even if Commerce's reliance on third-country CONNUMs constituted a change in

methodology, which it did not, Commerce provided Navneet with notice related to its use of

third-country CONNUMs.  This Court has recognized that notice is satisfied when Commerce

"provide{s} the affected parties with notice and the opportunity to comment before the final

determination is made."  *Koyo Seiko Co., Ltd. v. United States*, 516 F. Supp. 2d 1323, 1333 (Ct.

Int'l Trade 2007) (citing 19 U.S.C. § 1677m(g)); *see also SeAH Steel Corp. v. United States*, 704

F. Supp. 2d 1353, 1364 (Ct. Int'l Trade 2010) ("Even had Commerce changed its methodology,

the statute only requires the agency to provide the affected parties with notice and an opportunity

to comment before the final determination is made.").

The record demonstrates that Commerce provided Navneet with the requisite notice.

After publishing the Preliminary Results on October 1, 2021, Commerce invited the parties to

comment on the Preliminary Results, and extended the briefing schedule on October 27 and

November 10, 2021.  Final Results at 2 (Appx12530).  On November 8, 2021, Navneet

submitted its case brief and, on November 22, 2021, submitted its rebuttal brief.  *See* Navneet's

Case Br. (Appx12413-12444); Navneet's Rebuttal Br. (Appx82628-82635).  Thus, Commerce afforded Navneet with the requisite notice in the form of an opportunity to comment before issuing the Final Results.  Because Commerce was only obligated to provide Navneet with an opportunity to comment prior to its final determination in this matter, and it did, Navneet fails to establish lack of notice.  *See, e.g.*, *Koyo Seiko Co., Ltd.*, 516 F. Supp. 2d at 1334 (holding that "the notice given to the parties was adequate" because "Commerce was only obligated to notify them {of the revised methodology} before the final determination").

Navneet relies on *Shikoku Chemicals Corp. v. United States* for its lack-of-notice argument, but that case is inapposite.  *See* Pl. Br. at 22 (citing 795 F. Supp. 417, 419-22 (Ct. Int'l Trade 1992)).  In *Shikoku*, in the original LTFV investigation and the first four administrative reviews, Commerce permitted Shikoku to adjust home market prices to reflect charges paid by Shikoku to its subcontractor for repacking.  795 F. Supp. at 418.  In the final determination, however, Commerce changed its method of allocation by excluding from the repacking costs identifiable costs of making tablets — an approach that diminished home market repacking expenses and resulted in a higher than de minimis margin.  *Id.*  Plaintiffs contended that they had been unfairly penalized because Commerce applied a new methodology retroactively in spite of Shikoku's reliance over the years on the old formula for calculating the home market price packing adjustment.  *Id.*  In particular, plaintiffs claimed that they were damaged when Commerce adopted a new approach during the fifth and sixth reviews when they were almost eligible for consideration for revocation of the antidumping duty order.  *Id.* at 420.  Based on these facts, this Court held that Commerce's change in methodology at a late stage went against principles of fairness.  *Id.* at 421.  Thus, *Shikoku* involved a change to the method of calculating the repacking expenses — *not* a change in outcome based on the *same* calculations methodology.

24

Unlike *Shikoku*, in this case, Commerce did not alter its methodology for determining surrogate costs. Rather, what has changed here are the underlying facts, not the method. The underlying facts here are that Commerce required product characteristics, which Navneet failed to properly report in the margin calculation program and, as a result, Commerce was required to make adjustments to the program. Thus, Navneet's reliance on *Shikoku Chemicals* is misplaced.

In connection with its notice arguments, Navneet relies on the fact that this is the first administrative review in which it faces a higher than de minimis dumping margin. Pl. Br. at 26. But Commerce's margin analysis must be based on the record in this administrative review — *not* those that preceded or followed this administrative review. *See, e.g.*, *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) (holding that this Court's "review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusion.") (citations omitted). Although Navneet would have this Court disregard this evidence, Commerce found no basis to do so. *See* Final Results at 9 ("This information is on the record of this administrative review, and we find no reason to exclude some or all these cost records from the pool of potential surrogate costs.") (Appx12537). Navneet's disagreement with Commerce's reasoning amounts to a request that this Court "reweigh the evidence already considered by Commerce," which this Court should decline to do. *SolarWorld Americas, Inc.*, 910 F.3d at 1225; *see also Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015) ("This court declines Appellants' invitation to reweigh the evidence in order to reject Commerce's conclusions, which were well-supported and fully explained.").

25

**IV.     Navneet Failed To Exhaust Its Administrative Remedies Concerning Its Distortion Claims**

Navneet contends that Commerce's preference for using all available CONNUMs has resulted in a distortion.  Pl. Br. at 28-30.  In challenging Commerce's no-distortion finding, Navneet contends that Commerce conducted "a myopic examination of distortion" by focusing on the similarity of cost components.  *Id.* at 28-29.  In support of this argument, Navneet contends that its dumping margin was based on the match of a [███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████].

*Id.* at 29.  Navneet identifies other causes of distortion:  the fact that the match was to a non-identical CONNUM (different physical characteristics); the length of time matching and number of U.S. sales matching to the home-market CONNUM, the eligibility of the matching home-market CONNUM only because of surrogate costs; the monthly margins for the same U.S. CONNUM in other months of the period of review, the volume of U.S. sales affected relative to total U.S. sales; and the overall effect in light of Navneet's history.  *Id.* at 29.  Navneet failed to raise these arguments before Commerce and, thus, has waived its ability to raise them before this Court.

"Under 28 U.S.C. § 2637(d), {this Court} 'shall, where appropriate, require the exhaustion of administrative remedies' in civil actions arising from Commerce's antidumping duty determinations."  *JBF Rak LLC*, 790 F.3d at 1366.  This Court "takes a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases."  *Id.* (quoting *Corus Staal BV v. United States,* 502 F.3d 1370, 1379 (Fed. Cir. 2007));

*accord Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016).  It is "well established that arguments . . . not appropriately developed in a party's briefing may be deemed waived."  *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (citations omitted).  Issues that are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *Baley v. United States*, 942 F.3d 1312, 1331 (Fed. Cir. 2019) (citations omitted).

The fact-specific arguments related to distortion that Navneet now raises in this Court are nowhere to be found in its briefing before Commerce.  Rather, in those briefs, Navneet raises nothing more than unspecific and vague arguments concerning distortion.  *See* Navneet Case Br. at 2 ("It is a methodological error in {Commerce's} program that has created the appearance of dumping, but that distorts the reality of Navneet's situation and its U.S. sales.") (Appx12417); *id.* at 9 ("The program must be modified to remove this anomalous and (in this case) highly distortive programming language.") (Appx12424); *id.* at 25 ("{Commerce's} Methodology in the Preliminary Results Led to Distorted Costs") (Appx12440); *id.* at 26 ("Very clearly, {Commerce's} inadvertent methodology led to distorted results.") (Appx12441); *see also* Navneet's Rebuttal Br. at 1-2 ("In the Final Results, {Commerce's} should not distort the margin by reversing its settled practice regarding Navneet's G&A and incorporating the expenses of a different company, as urged by the petitioners.") (Appx82630-82631).  The Court should deem such undeveloped arguments waived.  *See JBF Rak LLC*, 790 F.3d at 1366 ("Because {plaintiff-appellant} failed to raise these issues before Commerce, the {Court of International Trade} correctly found it had not exhausted its administrative remedies.").

Further, the distortion arguments that Navneet raises before this Court are of a highly technical and specific nature related to Commerce's application of the DIFMER test and the

model match methodology based on specific data.  Commerce was not afforded an opportunity to address those arguments on the record.  In failing to raise these arguments before Commerce, Navneet has also impeded judicial review because this Court has no record of the agency's consideration and resolution of these issues.  This Court has recognized that requiring exhaustion "can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution."  *JBF Rak*, 961 F. Supp. 2d at 1279 (citing *McCarthy v. Madigan,* 503 U.S. 140, 145 (1992).

Because Navneet failed to raise its highly-technical and fact-specific distortion arguments before Commerce, it has failed to exhaust its administrative remedies and, thus, these arguments are waived.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny Navneet's motion for judgment on the agency record and sustain Commerce's Final Results in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director


<u>/s/ Franklin E. White, Jr.</u>
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

                          /s/ Antonia R. Soares

BRISHAILAH BROWN              ANTONIA R. SOARES
Attorney                               Senior Trial Counsel
U.S. Department of Commerce     United States Department of Justice
Office of the Chief Counsel for Trade   Civil Division
     Enforcement and Compliance     Commercial Litigation Branch
                               P.O. Box 480, Ben Franklin Station
                               Washington, DC 20044
                               Telephone: (202) 305-7405
                               Email: Antonia.Soares@usdoj.gov

February 1, 2023                  Attorneys for the United States

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 7,829 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>/s/ Antonia R. Soares</u>
ANTONIA R. SOARES

## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury that on this 1st day of February 2023, a copy of the foregoing "DEFENDANT'S RESPONSE TO RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENGY RECORD" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Antonia R. Soares</u>
ANTONIA R. SOARES

2