**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NAVNEET EDUCATION LTD.<br><br>      **Plaintiff,**<br><br>v.<br><br>UNITED STATES,<br><br>      **Defendant.**<br><br>and<br><br>ASSOCIATION OF AMERICAN<br>SCHOOL PAPER SUPPLIERS<br><br>      **Defendant-Intervenors.** | Court No. 22-cv-00132<br><br>**PUBLIC VERSION**<br>(Confidential Information removed from brackets on pp. 2, 10-11) |

**REPLY BRIEF OF PLAINTIFF NAVNEET EDUCATION LTD.**

Irene H. Chen
CHEN LAW GROUP, LLC.
200-A Monroe St., Ste. 100
Rockville, MD 20850
Tel (301) 760-7393
Email: Irene@chenlawgroup.com

Mark B. Lehnardt
Law Offices of David L. Simon
1025 Connecticut Ave., Ste 1000
Washington, DC 20036
Tel (202) 642-4850
Email: MarkLehnardt@DLSimon.com

March 17, 2023                    *Counsel to Plaintiff Navneet Education Ltd.*

### A.   TABLE OF CONTENTS

I.   COMMERCE'S UNCLEAR AND GENERAL DESCRIPTION OF ITS PRACTICE FAILS TO REBUT NAVNEET'S ARGUMENT THAT COMMERCE DEPARTED FROM THE SPECIFIC PRACTICE RELEVANT HERE.........................................................................1

A.   *Ripe Olives From Spain* Establishes How The Yes/No Toggle Continues To Be Commerce's Preferred Methodology...............................................................................8

B.   Commerce Impermissibly Altered The Factual Record By Changing "NO" To "YES" In The Programming Language...........................................................................................10

C.   Commerce Failed to Provide Navneet Notice and a Reasonable Explanation Before Changing its Methodology .........................................................................................14

II.   NAVNEET EXHAUSTED ITS ADMINISTRATIVE REMEDIES REGARDING ITS DISTORTION ARGUMENT.............................................................................................15

III.   CONCLUSION      .........................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Budd Co. v. United States*, 14 CIT 595, 746 F. Supp. 1093 (1990)..............................................14

*Fujian Mach. & Equip. Import & Export Corp. v. United States*, 25 CIT 1150,
178 F. Supp. 2d 1305 (2001) ...........................................................................................14

*Guizhou Tyre Co. v. United States*, 447 F. Supp. 3d 1373, 1375 (Ct. Int'l Trade
2020) ..................................................................................................................................11

*Melamine Chem., Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984)....................................14

*SeAH Steel Corp. v. United States*, 34 CIT 605, 615, 704 F. Supp. 2d 1353, 1361-
62 (2010)............................................................................................................................14

*Shikoku Chems. Corp. v. United States*, 16 CIT 382, 795 F. Supp. 417 (1992)........................13

*SKF USA Inc. v. United States*, 263 F.3d at 1382 (Fed. Cir. 2001)............................................13

*SKF USA Inc. v. United States*, 31 CIT 951, 491 F. Supp. 2d 1354 (2007) ..............................14

*Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)....................................13

**Statute**

19 U.S.C. §1677m(d) ............................................................................................................ 11, 14

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy,* 86 Fed. Reg.
15,645 (Dep't of Commerce March 18, 2021) ...........................................................6

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
Korea*, 70 Fed Reg 12,443 (Dep't of Commerce Mar. 14, 2005)..............................5

*Certain Frozen Warmwater Shrimp from Thailand*, 82 Fed. Reg. 30,836 (Dep't of
Commerce July 3, 2017) .............................................................................................6

*Certain Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg.
20,815 (Dep't of Commerce April 1, 2022) ...............................................................5

*Certain Stilbenic Optical Brightening Agents from Taiwan*, 80 Fed. Reg. 61,368
(Dep't of Commerce Oct. 13, 2015) ...........................................................................7

*Ripe Olives from Spain: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,068 (Dep't of Commerce July 1, 2021) .......................8

*Ripe Olives From Spain: Preliminary Results of Antidumping Duty Administrative Review; 2018–2019*, 85 Fed. Reg. 84,297 (Dep't of Commerce Dec. 28, 2020) ....................9

*Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2332 (Dep't of Commerce Jan 13, 2011) .........................................................................................4

Plaintiff Navneet Education Ltd. ("Navneet") respectfully submits this reply brief to the briefs in opposition filed by Defendant, the United States, ("Defendant" or "Commerce") and Defendant-Intervenors, Association of American School Paper Suppliers ("AASPS").

In its response brief, Commerce blurs what its precise practice is, mistakes the determination in *Ripe Olives*, and wrongly asserts that the YES/NO toggle is irrelevant. Defendant-Intervenors double down on Commerce's mistakes and otherwise fail to provide any supporting information different from Commerce's arguments.

### I.      COMMERCE'S UNCLEAR AND GENERAL DESCRIPTION OF ITS PRACTICE FAILS TO REBUT NAVNEET'S ARGUMENT THAT COMMERCE DEPARTED FROM THE SPECIFIC PRACTICE RELEVANT HERE

Commerce improperly departed from its practice when reverse engineering product physical characteristics for products sold only in third-country markets.  Commerce claims that it acted consistently with its practice but can only make this argument by blurring what practice it is talking about.  The precise Commerce practice relevant here is how Commerce defines available surrogate costs to use in the DIFMER test when some of a respondent's sales are sold but not produced during the POR and the respondent has not reported product physical characteristics with its cost database.  Commerce uses production costs of all products to determine CONNUM specific costs of production of products sold in the U.S. and home markets, but Commerce does not include products sold only in third-country markets in the pool of possible surrogate costs to be used in the DIFMER test when the respondent does not report the physical characteristics of those products with its cost database.  The unimpeachable evidence establishing this long-standing practice is the YES/NO toggle that has existed in Commerce's standard programming for years.

The YES/NO toggle in the standard margin program requires an answer to the question of whether product physical characteristics variables are included in the cost database.  A "YES" answer sends the program to the cost database for surrogate costs, while a NO sends the program to the sales databases for surrogate costs.  The relevant difference is that a YES includes costs for CONNUMs sold only in third country markets along with CONNUMs sold in the home and U.S. markets as potential sources for surrogate costs, while a NO includes only CONNUMs sold in the home or U.S. markets.   Navneet did not report product physical characteristics with its cost database, but Commerce flipped the toggle to YES by reverse engineering and adding those product physical characteristics to Navneet's cost database:

[



                                                                                              ]

Preliminary HM Program Log, 8298-8301 (emphasis added), Appx82147, and Final HM Program Log, Lines 8300-8303, Appx82709.  Commerce concedes that this is what it did: "because Navneet did not report product characteristics {for products sold only in third-country markets}, Commerce created variables for each of the eight physical characteristics in the CONNUMs in the cost database."  DOC Br. at 19.  In other words, Commerce reverse engineered the product physical characteristics for products sold only in third-country markets, added them to Navneet's costs database, then switched the toggle to YES.  But it wasn't necessary to reverse engeiner and add the product physical characteristics for these products sold only in third-country markets, which Commerce conceded, stating, "we find no reason to exclude some or all these cost records from the pool of potential surrogate costs."  Final Decision Memo

at 9, Appx12537.  "{N}o reason" isn't a reason at all.  *See* U.*K. Carbon & Graphite*, 931 F.

Supp. 2d at 1328 ( *quoting Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir.

1998) ("Courts look for a reasoned analysis or explanation for an agency's decision as a way to

determine whether a particular decision is arbitrary, capricious or an abuse of discretion")).

If reporting product physical characteristics for products sold only in third-country

markets was necessary for the margin calculation program, such that "Commerce was *required*

to make adjustments to the program" by reverse engineering product physical characteristics for

product sold only in third-country markets, *see* DOC Br. at 24 (emphasis added), there would be

no YES/NO toggle.  There would only be a YES or a question of whether Commerce should

apply facts available (or adverse facts available) under 19 U.S.C. § 1677e.

Instead, more than 10 years ago Commerce has recognized that respondents often don't

report product characteristics with the cost database, and thus the standard margin program looks

to the US and home-sales database only for surrogate costs:

> In our experience, respondents generally only report in the
> COP/CV file the per-unit cost, on a CONNUM-specific basis, and
> do not include the separate product characteristics fields used to
> derive the overall CONNUM.  Rather, these are reported in the
> sales file.  Therefore, the cost database is merged with the sales
> databases to attach the product characteristics to the CONNUMs
> reported in the cost database.

*SSSSC from Mexico 2008-09*, 76 Fed. Reg. 2332 (Dept. of Commerce Jan. 13, 2011) and

accompanying Dec. Mem. at Cmt. 1.  Despite recognizing that respondents generally do not

include product physical characteristics in their cost databases, Commerce has not changed the

YES/NO toggle, and generally has not required respondents to report those product physical

characteristics when they have not included them with their initial questionnaire responses.  *See*

DOC Br. at 9 (*citing SSSSC from Mexico*, 76 Fed. Reg. 2332 (Dept. of Commerce Jan. 13, 2011)

and accompanying Dec. Mem. at Cmt. 1.  Although Commerce claims this reality means that

"Commerce's adjustment to the calculations program is often *necessitated*," DOC Br. at 9, in fact, Commerce has not changed this aspect of the program.

The YES/NO toggle makes clear that reporting product physical characteristics in the cost database for products sold only in third-country markets is optional and that Commerce expects to use whatever is reported. There is no other explanation for the existence of the YES/NO toggle.

The administrative decisions Commerce cites to argue the contrary either support Navneet's arguments about the standard margin program or provide no support because they do not describe underlying details with enough specificity to understand what Commerce did. Further, all of the administrative decisions cited by Commerce pre-date its recent decision in *Ripe Olives from Spain,* where Commerce explained that CONNUMs sold only in third-country markets are "appropriately excluded" from consideration as surrogate costs for purposes of the DIFMER test. *See Ripe Olives from Spain:  Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,068 (Dep't of Commerce July 1, 2021) ("*Ripe Olives*"), and accompanying Dec. Mem. at cmt. 9. None of the administrative decisions relied on by Commerce shine light on the precise issue before this Court:  when physical characteristics are not reported for products sold only in third-country markets.

The two decisions Commerce relied upon in the Decision Memo as "instructive," *SSSSC from Mexico 2008-09* and *CORE from Korea 2002-03*, do not overcome the clear implication of Commerce's continuing inclusion of the YES/NO toggle in its standard margin program.

In *SSSSC from Mexico*, Commerce looked at the question of whether to include CONNUMs for products that were produced but not sold during the POR for potential uses as surrogate costs for products that were sold but not produced during the POR:

> Mexinox claims, the Department inadvertently limited the output
> file to only the CONNUMs that were sold during the POR. For
> purposes of cost indexing and searching for surrogate CONNUMs,
> Mexinox contends, the Department instead should utilize available
> cost data for all CONNUMs that Mexinox produced in the POR,
> not just products that were sold during the POR.

*See Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty*

*Administrative Review*, 76 Fed. Reg. 2332 (Dep't of Commerce Jan. 13, 2011) ("*SSSSC from*

*Mexico 2008-09*") and accompanying IDM at Cmt. 1; *see,* DOC Br. at 8-9, 14, 16, 18-21, 23.

Commerce there agreed that Mexinox's characterization was correct: "when a CONNUM was

produced and has a requisite cost, but was not sold during the POR (or in any quarter thereof),

the Department's program in this instance removed such cost CONNUMs from our analysis as

no product characteristics from the sales file are available." *Id.* Commerce also acknowledged

that "Mexinox reported production costs, but there were no corresponding sales of those

CONNUMs." Commerce determined that it should "revise {the} programming language in

order to capture the costs of all reported CONNUMs and not simply those that were sold." *Id.*

    *SSSSC from Mexico* is inapposite because, here, however because Commerce did not revise

the programming to remove the YES/NO toggle. Instead, it decided that – in Navneet's case – it

would affirmatively reverse-engineer the product physical characteristics so that it could set the

toggle to YES, whereas in other cases, such as *Ripe Olives*, Commerce simply uses what is

reported.

    The question in *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic*

*of Korea*, 70 Fed Reg 12,443 (Dep't of Commerce March 14, 2005)("*CORE from Korea*") and

accompanying IDM at Cmt.5, *see* DOC Br. at 14, 16, 18-21, was whether Commerce should use

surrogate costs from the most similar CONNUM as reported by respondent Dongbu; or, as

petitioners argued, require that respondent Dongbu submit historical pricing data from which

Commerce should draw surrogate costs.  *Id.*  Commerce agreed with Dongbu that Commerce should match to the closest CONNUM for surrogate costs – as Dongbu had reported – rather than require historical price data.  *Id.  CORE from Korea* supports Navneet's arguments because Commerce conformed its methodology to the respondent's reporting.

The other administrative decisions Commerce cites support Navneet's arguments.  In those decisions, Commerce generally does not directly discuss whether costs of CONNUMs sold only in third-country markets may be part of potential surrogate costs.  *Certain Oil Country Tubular Goods from the Republic of Korea*, 87 Fed. Reg. 20,815 (Dep't of Commerce April 1, 2022) ("*OCTG from Korea*"), Dec. Mem. Cmt.14; DOC Br. at 13.  In *OCTG from Korea*, the domestic interested parties argued that surrogate costs for goods sold but not produced during the POR should be drawn from costs reported in the prior POR.  Commerce rejected this methodology, explaining that, "Commerce's practice in assigning surrogate costs for products sold but not produced during the POR is to choose the most similar product produced during the POR, as long as it does not lead to distortions."  *Id.*  In rejecting the domestic interested parties' arguments, Commerce approved respondent, Hyundai Steel's explanation "that, for CONNUMs it sold but did not produce during the POR, it utilized Commerce's standard program for reporting a surrogate cost based on the most similar CONNUM.  *This in fact is Commerce's preferred practice in assigning surrogate costs for products sold but not produced during the POR*."  *Id.*(emphasis added).  Thus, contrary to Commerce's assertions, *OCTG from Korea* states that Commerce's preference is not to reverse engineer product physical characteristics when they are not reported, but to simply follow the standard program – which includes the YES/NO toggle – as Navneet did.

Similarly, in *Certain Frozen Warmwater Shrimp from Thailand*, 82 Fed. Reg. 30,836 (Dep't of Commerce July 3, 2017), Dec. Mem. Cmt. 3; DOC Br. at 13, 16-17, 23, the issue before Commerce was whether to use company-specific cost databases reported by respondent, Thai Union/Pakfood, that included all products sold, including products sold only in third-country markets; or an alternate, consolidated cost database – also provided by respondent Thai Union/Pakfood – that reported company-specific cost databases for only those products produced during the POR and sold in the U.S. or home markets. *Id*. Commerce used the more inclusive database that had been reported by Thai Union/Pakfood. This decision, however, is simply further evidence of Commerce using its standard margin program, including the YES/NO toggle based upon what is reported by the respondent. *Id*. In *Shrimp from Thailand*, the respondent reported all cost data, including for products sold only in third-country markets, thus the toggle was switched to YES. *Id.*

In *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy,* 86 Fed. Reg. 15,645 (Dep't of Commerce March 18, 2021), Dec. Mem., Cmt. 3; DOC Br. at 14, the question presented by respondent, NVR, was whether Commerce should include for possible surrogate costs all CONNUMs in NVR's cost database rather than only those for which NVR had reported the product physical characteristics. *Id*. Essentially, NVR argued that the toggle should be switched to YES, and Commerce should reverse-engineer missing product physical characteristics for the CONNUMs in NVR's cost database, even though the standard programming would case the toggle to be switched to NO, because NVR did not report complete product physical characteristics. *Id*. Commerce declined to reverse-engineer product physical characteristics, explaining that it would "continue to rely upon the product characteristics reported in NVR's COP database to assign the cost for the closest matching CONNUM." *Id.* As

with the other administrative decisions discussed here, Commerce's decisions demonstrate an

adherence to the standard margin program language, not a practice to reverse engineer product

physical characteristics for CONNUMs sold only in third-country markets when not reported by

the respondent.

In *Certain Stilbenic Optical Brightening Agents from Taiwan*, 80 Fed. Reg. 61,368 (Dep't

of Commerce Oct. 13, 2015) and accompanying IDM at Cmt 2; DOC Br. at 14, Commerce found

that the normal methodology produced distortive results, and thus used historical (pre-POR)

costs. *Id.*

The administrative decisions cited by Commerce support Navneet's expectation that

Commerce would follow its standard margin program.   These cases do not provide any support

for Commerce "extract{ing} physical characteristics" in the home market cost program to find

surrogate costs for sold but not produced product during the POR.  DOC Br. at 18.

**B.      *Ripe Olives From Spain* Establishes How The Yes/No Toggle Continues To Be
        Commerce's Preferred Methodology**

Navneet's reading of the *Ripe Olives from Spain* decision is correct.  Commerce's

analysis of *Ripe Olives from Spain* is not grounded in the language of the decision and cost

memoranda, and consequently mistakes the decision made in that case.  *See* DOC Br. at 16-17.

The *Ripe Olives* decision is clear that CONNUMs for products sold in third countries were

"appropriately excluded." *Ripe Olives from Spain: Final Results of Antidumping Duty*

*Administrative Review, 2018-2019,* 86 Fed. Reg. 35,068 (July 1, 2021), and accompanying Dec.

Mem., cmt. 9 (June 25, 2021) ("*Ripe Olives Final IDM*").

Commerce's analysis of *Ripe Olives from Spain* overlooks the precise facts of *Ripe*

*Olives from Spain*.  Commerce quotes from *Ripe Olives from Spain*, "Commerce relied on partial

facts available to adjust {the respondent's} reported CONNUM-specific costs to *include* the

{cost of merchandise} of identical products sold by {the respondent} *in third country markets.*" DOC Br. at 17 (alterations and emphasis in original).   Commerce further quotes, "Commerce 'continue{d} to adjust {the respondent's} reported cost database *to include the costs fo the identical products sold in countries other than the home market or the United States* or as we did in the {preliminary results}." *Id.* (alterations and emphasis in original).   These quotes about identical products do not undermine, but rather support Navneet's arguments.

In *Ripe Olives*, the problem Commerce addressed was that the respondent had only included product codes for products sold in the U.S. and home markets, omitting the third-country-market sales of products identical to those sold in the U.S. and home markets. Commerce explained, "Dcoop excluded merchandise sold in third country markets which had identical physical characteristics as the subject merchandise from the calculation of Dcoop's reported CONNUM-specific weighted-average costs." *Ripe Olives From Spain: Preliminary Results of Antidumping Duty Administrative Review; 2018–2019*, 85 Fed. Reg. 84,297 (Dep't of Commerce Dec. 28, 2020) ("*Ripe Olives From Spain Prelim*"), and accompanying Dec. Mem. at 17.   Similarly, Navneet argued that the pool of possible surrogate costs should include all CONNUMs sold in the U.S. and home markets, some of which also were sold in third-country markets.   *See* Navneet Case Br., Appx12416-Appx12443.

Commerce next argues that in *Ripe Olives*, it "not only adjusted the database to comport with its practice of selecting the most similar products available to establish surrogate costs, Commerce also relied on third-country costs in doing so."   DOC Br. at 17.   But this assertion also overlooks that the third-country costs Commerce relied upon were for CONNUMs already included in the pool of possible surrogate costs – these CONNUMs were also sold in the U.S. and home markets.

Contrary to Commerce's implication, *see id.*, the "appropriately excluded" language from *Ripe Olives* was precisely about products sold *only* in third country markets.  The domestic interested party there argued that some products were excluded from Commerce's adjustment for identical products sold in third-country markets, pointing to an incomplete total listed under the "Weighted Average" tab of a spreadsheet with sales of all CONNUMs sold in the U.S. and home markets.  *Ripe Olives From Spain Prelim*, 85 Fed. Reg. 84,297, and accompanying Dec. Mem. at 17.  Commerce explained, however, "the products included in the 'Weighted Average' tab are only those products assigned to a CONNUM that was reported by Dcoop in its home market and U.S. sales files."  *Id.*  Commerce explained what was missing from the "Weighted Average" tab: "these {missing} CONNUMs were not in Dcoop's {U.S. and home} sales files and were appropriately excluded from Commerce's adjustment."  *Id.*  This is precisely the result expected because of the YES/NO toggle in the standard margin program.

**B.      Commerce Impermissibly Altered The Factual Record By Changing "NO" To "YES" In The Programming Language**

Commerce's changing of "No" to "Yes" for the reporting of physical characteristics in the margin calculation program was a clear error of fact because it directly contradicted what Navneet reported in its response.  Commerce instructed the margin calculation program that Navneet had reported product physical characteristics in its cost database when in fact Navneet had not.  This impermissible alteraation by Commerce resulted in the inclusion of extraneous and distortive third country costs in the DIFMER adjustment. The simple change from the factually correct "NO" to the factually incorrect "YES," caused [

].  This [

] was a product sold during the POR, but not produced during the POR, and thus needed a surrogate cost for purposes of the DIFMER test.  When the above question about

the cost database is answered "NO," the [

]. The change in program

from "NO" to "YES," allowed surrogate costs from CONNUMs with sales only in third-country

markets, where the most similar CONNUM had [

]. *See* Final Calc

Memo, Appx82688-Appx83170.

      Commerce states in its response brief that an adjustment to the calculation program was

necessary "because respondents often fail to properly report product-characteristic information."

DOC Br.  at 20.  But it doesn't explain how this was necessary in light of the fact that this runs

contrary to its current practice with regard to DIFMER adjustments, as described in *Ripe Olives*

*from Spain.*  Further, this erroneously suggests that Navneet was somehow deficient in its

response.  Commerce cannot create a 'gap' in the factual record by disregarding information

already on the record that is not demonstrably deficient.  *Guizhou Tyre Co. v. United States*, 447

F. Supp. 3d 1373, 1375 (Ct. Int'l Trade 2020).  Even before creating the 'gap' in the factual

record, and applying some sort of facts available, Commerce has to provide Navneet an

opportunity to "correct" the error. 19 USC §1677m(d). Tellingly, Commerce did not request that

Navneet provide any further information regarding the physical characteristics of third-country

CONNUMs or provide any additional information regarding physical characteristics in it is cost

database, and Navneet did not volunteer this information in its timely-submitted response. *See Navneet's Supplemental Sec. A-D Questionnaire Response*, Appx81419-82002.

Commerce alleges erroneously that even though "Navneet did not report physical characteristics in its cost database," this did not "preclude Commerce from adjusting Navneet's responses to capture that information given that the dumping calculation program requires physical characteristics to identify surrogate CONNUMs." DOC Br. at 20 (citing Final Results at 9).  Commerce's own margin program and recent practice contradict its position. The standard margin-calculation programs set the expectations for foreign producers and exporters as they adjust their pricing practices to U.S. trade law.  These programs state that if a respondent does not report product physical characteristics with cost database, surrogate costs for the DIFMER test are limited to CONNUMS sold in the U.S. and home markets.  If it were the case that the physical characteristics were required in every instance, why did Commerce not insist on Navneet's submission of those physical characteristics, and why does the margin programming have a choice of "YES" or "NO?"

Supporting this programming is the final results in *Ripe Olives*, where Commerce stated that for purposes of the DIFMER test as applied to CONNUMs sold in the home market but not produced during the POR, costs of CONNUMs sold only in third-country markets are "appropriately excluded."

Commerce claims that it was required to consider Navneet's "meaningless placeholder {third country} CONNUMs" from its cost data "given that Commerce's dumping calculation program requires physical characteristics to identify surrogate CONNUMs by way of model matching." DOC Br. at 22. Navneet did not include product physical characteristics in its cost of production database. Commerce claims that it had found "no reason to exclude some or all of

12

those cost records from the pool of potential surrogate results." *Final Decision Memo* at 9. Given that Navneet did not report the third country CONNUMs for this purpose and did not report the physical characteristics at all, Commerce has failed offer any reasonable explanation why use of these data was not distortive.

Defendant-Intervenor calls the YES/NO toggle an absurdity – because it allows the respondent to determine what methodology Commerce will use, "Navneet would have this court determine that where a respondent fails to comply with Commerce's cost reporting instructions, that lack of compliance requires the agency to both ignore the record evidence and to make adjustments favorable to the respondent." Def.-Int. Br. at 8. But this claim ignores what Commerce has done and what it can do. Commerce set the methodology itself when preparing standard margin program. Commerce is free to change this methodology upon proper notice, and Commerce can require that a respondent submit the information in a supplemental questionnaire or fill gaps with facts available if it explains how that information is necessary under 19 U.S.C. § 1677e. For the last many years, and continuing today, however, Commerce has decided to keep the YES/NO toggle in the standard margin program, thus indicating that it does not view as necessary reporting of product physical characteristics for products sold only in third-country markets. And Commerce did not identify the absence of product physical characteristics in the cost database as a deficiency or require that Navneet report those product physical characteristic in a supplemental questionnaire response. *See* 19 U.S.C. § 1677m(d).

Finally, Defendant-Intervenors argue that "Commerce committed no error in setting the surrogate cost macro to 'YES.'" Def.-Int. Br. at 11. But what Commerce did in this case was to reverse engineer product characteristics on its own initiative with the result being Navneet's margin shooting up from *de minimis* to 20.22%. In other cases with similar circumstances,

Commerce did *not* reverse engineer product characteristics.  Treating similarly situated parties differently is an error.  *See SKF USA Inc. v. United States*, 263 F.3d at 1382 (Fed. Cir. 2001) (*quoting Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)) ("it is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently'").

### C.  Commerce Failed to Provide Navneet Notice and a Reasonable Explanation Before Changing its Methodology

Commerce failed to provide Navneet with the required notice and a reasonable explanation before changing its methodology regarding use of third-country CONNUMs for its DIFMER adjustment.  Commerce claims it is only required to provide an opportunity to comment on the change before the final results.  DOC Br. at 23.  But this Court in *Shikoku* explained that established practices cannot be changed so easily.  Thus this Court should reject Commerce's argument.

When a practice is well established, Commerce must give more notice than when it makes minor changes from review to review.  *See Shikoku Chems. Corp. v. United States*, 16 CIT 382, 386-89, 795 F. Supp. 417, 419-22 (1992) ("Principles of fairness prevent Commerce from changing its methodology at this late stage.  Commerce is required to administer the antidumping laws fairly." (*Citing Melamine Chem., Inc. v. United States*, 732 F.2d 924, 933 (Fed. Cir. 1984); *Budd Co. v. United States*, 14 CIT 595,  602, 746 F. Supp. 1093, 1099 (1990))).  Commerce attempt to distinguish *Shikoku* based upon the five-year practice at issue there.  DOC Br. at 24 (highlighting the investigation and four subsequent administrative reviews).  Here, the practice is memorialized in the years-old standard margin program that is applied in all market-economy cases.

Commerce can change one methodology in favor of another when necessary to calculate a more accurate dumping margin, subject to *two* important considerations.  *See SKF USA Inc. v. United States*, 31 CIT 951, 491 F. Supp. 2d 1354, 1362 (2007) ("[I]t is within Commerce's expertise and discretion to update its methodology for both increased accuracy and ease of use"). The first restriction is that Commerce may not alter its methodology where a respondent has detrimentally relied on an old methodology used in previous reviews.  *See Fujian Mach. & Equip. Import & Export Corp. v. United States*, 25 CIT 1150, 1169-70, 178 F. Supp. 2d 1305, 1327 (2001). Second, Commerce must explain the basis for its change of methodology and demonstrate that its explanation is in accordance with law and supported by substantial evidence. *See id.  SeAH Steel Corp. v. United States*, 34 CIT 605, 615, 704 F. Supp. 2d 1353, 1361-62 (2010).   It is well-established that Navneet has long relied upon Commerce's public standard margin-calculation program to conform its pricing behavior to U.S.  *See* Navneet Case Br. at 1-2, 6 n.4, 8 n.10 (citing "the Department's ME Macros program, as published at https://access.trade.gov/resources/sas/programs/amcp.html"), Appx12416-12417, Appx12421, Appx12423.  As discussed in its opening brief, Navneet has an long track record of conforming its pricing in the U.S. market to the requirements of U.S. law and practice, with de minimis or zero margins the reward for Navneet's diligence in abiding by the law.

Before Commerce can change methodologies as entrenched as those in the standard margin program, it must give notice and a valid explanation for the need to make the change. Commerce did not take these steps here.

## II.     NAVNEET EXHAUSTED ITS ADMINISTRATIVE REMEDIES REGARDING ITS DISTORTION ARGUMENT

Navneet properly exhausted its administrative remedies regarding its distortion argument. Commerce claims that Navneet failed to exhaust its administrative remedies regarding the

distortive effect of Commerce's inclusion of third country CONNUMs into the margin

calculation.  See DOC Response Br. at 26.  Commerce's claim is without merit and should be

rejected because Navneet argued the distortion issue at length in its case brief and Commerce

specifically addressed and rejected Navneet's position in the Final Results.

In evaluating the exhaustion requirement, the determinative question is whether

Commerce was "put on notice" of the argument, not whether the argument was raised in exactly

the same words before the agency. *See Trust Chem Co. v. United States*, 791 F. Supp.2d 1257,

1268 (Ct. Int'l Trade 2011).  Here, there is no question that Commerce was put on notice before

the Final Results of Navneet's argument that its actions were distortive. In the Final Results,

Commerce addressed the distortion issue, specifically finding that "including these third country

CONNUMs were not distortive," concluding that cost components for third country CONNUMs

were within the range of cost components for home market and U.S. CONNUMs. Final Decision

Memo at 9; Appx12537.  In fact, Commerce admits that Navneet raised the argument of

distortion in its case brief before the agency. DOC Response Br. at 27.

Commerce's claims that Navneet's arguments were not well-developed or are perfunctory

should also be rejected. DOC Response Br. at 26-27. There was nothing perfunctory about

Navneet's arguments before the agency. Navneet's entire 28-page case brief was devoted to the

issue of Commerce's improper inclusion of third country CONNUMs in the margin program and

why that resulted in a distorted dumping margin. Navneet Case Brief; Appx 12411-12444.

Navneet explained at length the errors in the margin programming code, and argued that this

error resulted in the inclusion of third country CONNUMs which then resulted in "anomalous

product comparison" which "led to an erroneous finding of dumping." See Navneet Case Br. at

pp. 2-3; Appx12417-12418. Navneet also pointed out that the "production cost of products sold

in third countries is not relevant and not appropriate when (as here) the home market is the Comparison market." See Navneet Case Br. at 3; Appx12418. Navneet argued that products sold in third countries "may have different physical characteristics that are not accounted for by the Department's product matching criteria." See Navneet Case Br. at 11, n.11; Appx12426. These and other arguments in Navneet's case brief directly alerted Commerce to the issue at hand and provided the agency with a sufficient opportunity to address the issues. *See, e.g., Fabrique De Fer De Charleroi S.A. v. United States*, 25 CIT 741, 744, 155 F. Supp. 2d 801, 806 (2001) ("plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.") (citations omitted).

As to Commerce's claims that Navneet raised "highly technical arguments," those arguments all relate to the same issue – the distortive effect of Commerce's inclusion of third country CONNUMs, which Navneet argued in its case brief.  Navneet is merely citing factual examples from the underlying record of the how the final margin calculation was distorted by Commerce's improper inclusion of third country CONNUMs.  Commerce understood Navneet's argument in the Final Results because, referencing factual record cost data, it squarely addressed and rejected Navneet's argument that inclusion of third country costs were distortive to the dumping margin. Final Decision Memo at Cmt. 1;  *See, e.g., Trust Chem*, 35 CIT at    , 791 F. Supp. 2d at 1268 n.27 ( exhaustion satisfied when information cited on appeal was "necessarily before the agency" below); *Ningbo Dafa Chem, Fiber Co. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009) (exhaustion satisfied where record contained "at least a suggestion" of plaintiff's argument on appeal).  All of the margin calculation information that Navneet cites to support its claim of distortion was before the agency when it decided the Final Results.

Commerce's arguments regarding exhaustion of administrative remedies should be rejected. The record is clear that Navneet exhausted its administrative remedies with regard to its argument that Commerce's inclusion of third country costs improperly distorted the final dumping margin.

## III.    CONCLUSION

Commerce explicitly stated its practice in *Ripe Olives*, that costs for CONNUMs sold only in third-country markets are "appropriately excluded" from use as surrogate costs for purposes of the DIFMER test.  Navneet conformed its pricing behavior to its understanding of Commerce's methodologies and did not dump merchandise in the United States.  Through an unannounced programming change and Commerce's alteration of Navneet's database, Navneet went from good corporate citizen and a 0.00% margin to appearing to be a furtive foreign producer with an aberrant 20.22% margin.  Navneet has always been careful to discipline its commercial activity within the rules of trade, but is being punished because it could not guess that Commerce would change its methodology, alter Navneet's cost database, and treat Navneet differently than it treated the respondent in *Ripe Olives*.  Commerce's actions violate its responsibility to provide notice and to administer the law fairly.  Accordingly, this Court should remand this case with instructions for Commerce to recalculate Navneet's dumping margin in harmony with *Ripe Olives*.

Respectfully submitted,

/s/Irene H. Chen
Irene H. Chen
CHEN LAW GROUP, LLC.
200-A Monroe St., Ste. 100
Rockville, MD 20850
Tel (301) 760-7393
Email: Irene@chenlawgroup.com

18

_/s/Mark B. Lehnardt_
Law Offices of David L. Simon
1025 Connecticut Ave., Ste 1000
Washington, DC 20036
Tel (202) 642-4850
Email: MarkLehnardt@DLSimon.com

Date: March 17, 2023

_Counsel to Plaintiff Navneet Education Ltd._

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The brief contains 5406 words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, and the Table of Authorities, the signature block, and the present certificate).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.

Dated: March 17, 2023

/s/ Irene H. Chen
Irene H. Chen

*Counsel to Plaintiff Navneet Education Ltd.*