NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NAVNEET EDUCATION LTD.,<br><br>                Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>                Defendant,<br><br>    and<br><br>ASSOCIATION OF AMERICAN SCHOOL PAPER SUPPLIERS, ACCO BRANDS USA LLC, NORCOM, INC., and TOP FLIGHT, INC.<br><br>                Defendant-Intervenors. | Before:  Hon. Stephen A. Vaden,<br>            Judge<br><br>Court No. 22-00132<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>**Business Proprietary Information Removed from Pages: 3-5, 7-9** |

<u>AMENDED RESPONSE OF THE ASSOCIATION OF AMERICAN SCHOOL PAPER SUPPLIERS AND ITS INDIVIDUAL MEMBERS TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

                                      Timothy C. Brightbill, Esq.
                                      Maureen E. Thorson, Esq.
                                      Nicole C. Hager, Esq.

                                      Wiley Rein LLP
                                      2050 M Street, NW
                                      Washington, DC 20036
                                      (202) 719-7000

                                      *Counsel to Association of American School*
                                      *Paper Suppliers and its individual members*

**February 15, 2023**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................1
II. STATEMENT OF FACTS ...............................................................................................1
   A. Commerce's Use of Cost Data To Evaluate Differences in Merchandise ...................................................................................................1
   B. Factual Background ............................................................................................3
III. SUMMARY OF ARGUMENT ........................................................................................6
IV. ARGUMENT ....................................................................................................................7
V. CONCLUSION ...............................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)..................................................................................................7

*Shakeproof Assembly Components, Div. of Ill. Tool Works v. United States*,
   268 F.3d 1376 (Fed. Cir. 2001)..........................................................................................11, 13

*Smith-Corona Grp. v. United States*,
   713 F.2d 1568 (Fed. Cir. 1983)..................................................................................................7

*Tri Union Frozen Prods., Inc. v. United States*,
   163 F.Supp.3d 1255 (Ct. Int'l Trade 2016) ...............................................................................7

**Statutes**

19 U.S.C. § 1516a(b)(B)(i) .............................................................................................................11

19 U.S.C. § 1677a .............................................................................................................................1

19 U.S.C. § 1677b .............................................................................................................................1

**Regulations**

19 C.F.R. § 351.401 .........................................................................................................................1

19 C.F.R. § 351.411 .........................................................................................................................2

Import Admin. Policy Bulletin No. 92.2 (July 29, 1992) ......................................................2, 3, 4, 5

**Administrative Materials**

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
   Korea*, 70 Fed. Reg. 12,443 (Dep't Commerce Mar. 14, 2005) ................................................3

*Certain Stilbenic Optical Brightening Agents from Taiwan*,
   80 Fed. Reg. 61,368 (Dep't Commerce Oct. 13, 2015) ............................................................2

*Ripe Olives from Spain*,
   86 Fed. Reg. 35,056 (Dep't Commerce July 1, 2021) .......................................................11, 12

*Stainless Steel Sheet and Strip in Coils from Mexico*,
   76 Fed. Reg. 2,332 (Dep't Commerce Jan. 13, 2011) ......................................................12, 13

I. **INTRODUCTION**

On behalf of the Association of American School Paper Suppliers ("AASPS") and its individual members,[1] we respectfully submit this response to the November 3, 2022 opening brief of plaintiff Navneet Education Ltd. ("Navneet"). Pl.'s Mem. In Supp. of Rule 56.2 Mot. for J. on the Agency R. (Nov. 3, 2023), ECF No. 23 ("Navneet's Brief"). The AASPS adopts the arguments made in the United States' February 1, 2023 response brief. Def.'s Mem. In Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Feb. 1, 2023), ECF No. 28 ("Government's Brief"). In this brief, the AASPS provides additional context and arguments to aid the Court's understanding in Navneet's appeal.

II. **STATEMENT OF FACTS**

The AASPS provides the following legal and factual background pertinent to this appeal.

A. **Commerce's Use of Cost Data To Evaluate Differences in Merchandise**

To calculate antidumping duty margins, the U.S. Department of Commerce ("Commerce") compares the prices at which relevant goods are sold in the United States against the above-cost prices at which the same or similar goods are sold in the subject country ("normal value"). *See generally* 19 U.S.C. § 1677a; 19 U.S.C. § 1677b; 19 C.F.R. § 351.401. In annual administrative reviews, Commerce accordingly seeks information on the respondent companies' U.S. and home-market sales of relevant goods; it also seeks information on product-specific manufacturing costs incurred during the period of review ("POR"). Appx10750 (requesting that Navneet report home-market sales); Appx10784 (requesting that Navneet report U.S. sales); Appx10822-10823 (directing Navneet to report cost information "based on the actual costs incurred by your company during the period of review . . .").

---

[1] The individual members are ACCO Brands USA LLC, Norcom, Inc., and Top Flight, Inc.

1

To facilitate appropriate comparisons between U.S. and home-market sales, Commerce identifies and rank-orders relevant product characteristics for the goods subject to an order. Respondents are then instructed to use these characteristics to construct a control number or "CONNUM" for each product model sold. *See, e.g.*, Appx80703–80709; Appx11429–11435; Appx80763–80769; Appx11489–11495.[2] Commerce uses these CONNUMs to match U.S. sales with home-market sales of identical or similar merchandise. In making these "model matches," Commerce applies its "differences in merchandise" (or "DIFMER") test to make reasonable allowances for physical differences between the goods sold in the United States and in the foreign market. *See* 19 C.F.R. § 351.411; Import Admin. Policy Bulletin No. 92.2 (July 29, 1992), *available at* https://enforcement.trade.gov/policy/bull92-2.txt ("Policy Bulletin"). Typically, the "DIFMER" analysis is based on the variable production costs for each product model produced during the review period. *See* Policy Bulletin.

Where a respondent has POR sales of product models that it did not produce during the review period, Commerce conducts the DIFMER analysis for those products (and any other necessary cost-related analyses) based on the production costs for the most similar items manufactured during the POR. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Stilbenic Optical Brightening Agents from Taiwan*, 80 Fed. Reg. 61,368 (Dep't Commerce Oct. 13, 2015) (final results of antidumping duty admin. rev.; 2013-2014) at cmt. 2 ("It is the Department's practice to rely on the reported costs of a similar product in instances where a respondent did not manufacture a product during the reporting period."); Issues and Decision

---

[2] The product characteristics used to build CONNUMs for Indian lined paper products are as follows: product form (*i.e.*, whether the product is loose paper or bound); paper volume; paper brightness; binding type; cover material; back material; number of inserts; and insert material. *See* Appx10757–10760; Appx10790–10793.

Memorandum accompanying *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 70 Fed. Reg. 12,443 (Dep't Commerce Mar. 14, 2005) (notice of final results of the tenth admin. rev. and new shipper rev. of the antidumping duty order) at cmt. 5 ("We verified that Dongbu used the Department's hierarchy to choose the most similar product produced during the POR as a surrogate and found no evidence of distortion in this methodology.").

Commerce generally considers U.S. and home-market products insufficiently similar to generate accurate price comparisons where the cost differences attributable to their physical differences are greater than 20 percent of the U.S. CONNUM's total manufacturing costs. *See* Policy Bulletin. Where Commerce determines that the difference is too great, *i.e.*, greater than 20 percent, Commerce normally concludes that the home-market and U.S. products are too physically dissimilar for a comparison of their prices to lead to an accurate margin calculation. *Id.* If no home market CONNUMs pass the DIFMER test, then Commerce will use an alternative calculation methodology, constructed value, to test whether dumping has occurred. *See id.*

### B.  Factual Background

After initiating an administrative review for the period from September 1, 2019 through August 31, 2020, Commerce selected Navneet as a mandatory respondent and issued it an initial antidumping questionnaire. *See* Appx10717–10902. The questionnaire directed Navneet to report relevant sales during the POR; it also directed the company to report the CONNUM-specific production costs it incurred during the POR. Appx10750; Appx10784; Appx10822–10823; Appx10836–10837. Navneet's response indicated that it sold [     ] CONNUMs, or products, in its home market that it did not produce during the POR. Appx81317–81321 and Appx11903–11906; Appx81840–81935 and Appx11592–11693; *see also* Appx82646–83647 and Appx12478–12479. For these CONNUMs, the company suggested surrogate cost CONNUMs in the field "[          ]." Appx81317–81321 and Appx11903–11906 (Navneet's cost database

3

printout). Navneet also provided cost information for CONNUMs that it only sold in third countries, *i.e.*, CONNUMs not reported in either its home market or U.S. sales databases. *See id.*; Appx81840–81935 and Appx11591–11693; Appx81998–82012 and Appx11728–11744; *see also* Appx12418; Appx82648 and Appx12480. For [   ] of the CONNUMs that Navneet sold but did not produce during the period, Navneet proposed using the costs for a CONNUM [

]. *See, e.g.*, Appx82648 and Appx12480.³ Additionally, while Navneet's cost database identified each CONNUM manufactured during the POR, Navneet did not include separate fields for each product characteristic reflected in the cost CONNUMs, despite stating that it had followed Commerce's instruction that it do so. Appx11580–11581; Appx81317–81321 and Appx11901–11906.

Commerce preliminarily assigned surrogate costs to Navneet's sold-but-not-produced CONNUMs based on the most similar items produced during the POR, regardless of the market in which those CONNUMS were sold. *See, e.g.*, Appx12387. In so doing, the agency did not rely on Navneet's suggested surrogate CONNUMs, but instead conducted its own analysis of relevant product characteristics. *See id.*; Appx12419–12420; *see also* Appx82146–82147 and Appx12394. Commerce's standard computer programming allows for this when the %LET MATCH_NO_PRODUCTION macro ("surrogate cost macro") is set to "YES," *i.e.*, turned on. *See* Appx12419–12420; *see also* Appx82146–82147 and Appx12394. To conduct its own analysis for the preliminary results, Commerce accordingly turned on the surrogate cost macro. *See*

---

³     Specifically, Navneet proposed using the costs for CONNUM [   ] as the surrogate costs for sold-but-not produced [   ]. Appx81317–81321 and Appx11903–11906 (Navneet's cost database printout); Appx81840–81935 and Appx11591–11693 (Navneet's revised home-market sales database printout); Appx81998–82012; Appx11728–11744 (Navneet's revised U.S. sales database printout).

Appx82147; Appx12394. Put another way, Commerce told the computer program to independently identify surrogate CONNUMs based on relevant product characteristics, rather than simply accept Navneet's suggestions.

Commerce's standard surrogate cost programming incorporates a second macro –"%LET COST_PROD_CHARS" ("surrogate cost source macro"). *See* Appx82147 and Appx12394; *see also* Appx82650–82651 and Appx12482–12483. The surrogate cost source macro is technical in nature and identifies the source of the physical characteristic information used to identify the cost CONNUMs most physically similar to the goods sold in the home/U.S. markets. Appx82650–82651 and Appx12482–12483. By setting this macro to "YES", *i.e.*, %LET COST_PROD_CHARS = YES;, Commerce identifies the cost database as the source for the physical characteristic information. *Id.* Setting this macro to "NO" instructs the computer program to source the physical characteristic information from the sales databases and merge that data with the cost database. *Id.*

Here, for the preliminary results, Commerce itself added to Navneet's originally-reported cost database the product characteristics fields that Navneet [

], and then set the surrogate cost source macro to "YES." *See* Appx12387 (noting that the agency added the physical characteristics into the cost database); *see also* Appx82147 and Appx12394. Commerce's decision to insert and populate the product characteristics fields itself made sense, given that the cost database included CONNUMs not present [


]. Further, Commerce had all the data needed for properly generating the product characteristics fields, because Navneet's cost reporting was CONNUM-specific, and the product characteristics fields simply break out individual portions of the CONNUM to which the fields

5

pertain. For example, the first two digits of the CONNUMs in this case are "01" or "02," indicating the form of the product as either bound or loose-leaf. Appx80703–80704 and Appx11429–11430. To generate each CONNUM-specific field for product form, Commerce needed only to pull the appropriate two digits from the beginning of each relevant CONNUM – information that was already in the cost database as reported by Navneet. *See, e.g.*, Appx80701–80704 and Appx11427–11429 (confirming that CONNUMs are simply concatenations of product characteristic codes); Appx81317–81321 and Appx11903–11906.

Navneet argued in its case brief that Commerce erroneously included the cost of products sold only in third countries in its surrogate cost analysis. *See generally* Appx12413–12443. The AASPS submitted a rebuttal brief explaining that there was no error and that Commerce's preliminary results were consistent with agency precedent. *See generally* Appx82636–82657 and Appx12472–12489. In the final results, Commerce rejected Navneet's argument and continued to assign surrogate costs to the sold-but-not-produced CONNUMs by using the surrogate cost of the most similar item produced during the POR, regardless of the market in which Navneet sold the item. *See* Appx12533–12537.

### III.   SUMMARY OF ARGUMENT

This Court should deny Navneet's motion and affirm Commerce's final results. Navneet challenges Commerce's reliance on the costs to produce goods sold in third-country markets where production costs for goods sold in its home-market were not on the record. Navneet contends that Commerce's final results were based on an "error in fact" because of how Commerce's standard computer programming operates. Navneet further argues that Commerce's decision in *Ripe Olives from Spain* bars the agency from relying on costs for products sold in a third-country market, even if those products are the most physically similar to those for which cost information was missing.

Navneet's arguments are unpersuasive. In its cost reporting, Navneet itself [

]. Moreover, the company fundamentally misunderstands Commerce's computer programming as well as agency precedent. Although Navneet contends that Commerce is prohibited from considering third-country products where a company fails to report product characteristic fields in its cost database, the computer code on which it relies reflects no such prohibition – and certainly not a legal prohibition. Rather, the code simply defines the source from which the program pulls the relevant product characteristics data. Additionally, while Navneet relies heavily on *Ripe Olives from Spain*, that case did not involve surrogate costs. Meanwhile, other agency precedent speaks directly to the issue here and confirms that Commerce acted consistently with its practice.

## IV.   ARGUMENT

The antidumping statute provides "tremendous deference to the expertise of {} Commerce in administering the antidumping law." *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983). Trade remedy proceedings "involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996). "In situations involving complex and technical methodological choices . . . Commerce is given a wide level of discretion and the court need only address whether Commerce's methodological choice is reasonable." *Tri Union Frozen Prods., Inc. v. United States*, 163 F.Supp.3d 1255, 1308 (Ct. Int'l Trade 2016).

In the review at bar, Navneet sold certain goods that were not produced during the POR. *See, e.g.*, Appx82646–83647 and Appx12478–12479. Because there were no production costs incurred during the POR for these goods, Commerce was required to use surrogate costs for purposes of its DIFMER analysis. *See* Appx12387. Navneet made suggestions in its cost database

as to the product models from which Commerce should derive surrogate costs. Appx81317–81321 and Appx11903–11906; *see also* Appx82647 and Appx12479. Commerce, however, conducted its own analysis, assigning surrogate costs based on the products produced during the POR that were most physically similar to those for which the agency lacked POR-specific cost information. Appx12536–12537; Appx12387; Appx82146–82147 and Appx12394. This was an eminently reasonable methodological choice.

Nonetheless, Navneet challenges this methodology, arguing that Commerce inappropriately identified product models sold only in third-country markets as a source for surrogate costs. *See* Navneet's Brief at 18. Navneet's arguments are unavailing. Not only is Navneet's claim marred by the company's own inconsistency, it seeks to convince the court of an absurdity. Specifically, Navneet would have this court determine that where a respondent fails to comply with Commerce's cost reporting instructions, that lack of compliance requires the agency to both ignore the record evidence and to make adjustments favorable to the respondent. Such a proposition is utterly inconsistent with the agency's statutory duties to consider the entire record and to render an accurate margin calculation. It is also premised on a fundamental misunderstanding of the agency's computer programming, the purpose of surrogate cost assignment, and agency precedent. As such, this Court should deny Navneet's motion and affirm the agency's surrogate cost selection.

As an initial matter, while Navneet argues that the agency is prohibited from relying on third-country products in identifying surrogate costs for goods sold-but-not-produced during the POR, Navneet itself [                                                                        ] for its

8

sold-but-not-produced products. *See* discussion at 4, *supra*.[4] Commerce observed this incongruity in Navneet's position in its final results. Appx12537. Having itself recognized that third-country CONNUMs can provide appropriate surrogate costs, Navneet's challenge to Commerce's reliance on third-country CONNUMs rings hollow.

More to the point, the third-country products on which Commerce relied for surrogate costs were the products most physically similar to the sold-but-not-produced home-market CONNUMs for which costs were not available on the record. *See* Appx12536–12537. These third-country products were thus the goods most likely to result in an accurate assessment of the cost to produce the sold-but-not produced CONNUMs. Navneet's reason for seeking to displace Commerce's reasonable choice is simple: if Navneet can limit the pool of surrogate cost CONNUMs, it will manipulate the DIFMER adjustment to its advantage, thereby artificially eliminating its dumping margin. In a bid to achieve this result, the company attempts to convince the Court that Commerce's final results were based on an "error in fact," assigning legal significance to the agency's standard computer programming where none exists. There was no error, as Commerce's surrogate cost programming assigned surrogate costs on the basis of the most physically similar CONNUMs.

Navneet claims that "if a respondent does not report product physical characteristics with its submitted cost database, surrogate costs for the DIFMER test are limited to CONNUMs sold in the U.S. and home market." Navneet's Brief at 18. Navneet infers this supposed limitation from the agency's computer programming language, which Navneet characterizes as "simply ask{ing} whether product physical characteristics were reported with the cost database and appl{ying} one

---

[4] Navneet assigned surrogate costs to CONNUM [          ] in its revised U.S. or home market sales databases.

9

methodology if the answer is 'YES' and a different methodology if the answer is 'NO.'" *Id.* at 19. The company further contends that if the answer is "NO," Commerce "limits the program's search for matching CONNUMs to just CONUMMs sold in the home and {U.S.} markets during the {period of review}." *Id.* at 20. Navneet misunderstands both the programming language and its purpose. *See also* Government's Brief at 19–21.

As explained above, the surrogate cost source macro identifies either the cost database used in the margin calculations or, alternatively, the home/U.S. sales databases as the source of the physical characteristic information used to determine the most physically similar surrogate CONNUMs for cost purposes. Appx82650–82651 and Appx12482–12483. What it does *not* do is ask whether a respondent reported the product characteristics information in its cost database. *Id.* Instead, it simply asks if that information is within the cost database being used in the calculations. *Id.* If Commerce sets the surrogate cost macro to "YES," the product characteristics information is accordingly pulled from within the cost database being used in the calculations. *Id.* Where Commerce sets the surrogate cost macro to "NO," this instructs the program to source the physical characteristic information from the sales databases being used in the calculations and merge that data with the cost database. *Id.*

Navneet asserts that because it did not report separate product characteristics in its cost database—contrary to Commerce's instructions—Commerce is prohibited from using the cost database (which included third-country costs) as a source of surrogate cost information. *See* Navneet's Brief at 20. Putting aside the obvious question of whether computer programming can impose legal limitations on the agency's authority and discretion to calculation margins in the way it deems most suitable, Navneet's argument fails to recognize that Commerce itself added the product characteristics to the cost database that it used in the calculations. *See* Appx12387; *see*

*also* Appx82147 and Appx12394.[5] Accordingly, Commerce committed no error in setting the surrogate cost macro to "YES." Instead, the agency's instruction properly reflected its adjustments to the originally-reported cost database.

Navneet cannot convincingly restyle its own reporting failure to prevent the agency from exercising its judgment to appropriately match sales with costs, and thus to make appropriate DIFMER adjustments. Accepting Navneet's argument would let a respondent dictate aspects of its dumping calculation through selective non-compliance with instructions. It would also require the agency to ignore facts on the record – such as the third-country costs that Navneet reported in its cost database. Neither proposition is consistent with the agency's duty to consider the record or to calculate margins accurately. 19 U.S.C. § 1516a(b)(B)(i) (providing the Commerce's antidumping decisions must be grounded in substantial record evidence); *Shakeproof Assembly Components, Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (quoting *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).

Navneet next asserts that Commerce has articulated a practice or policy of ignoring third-country costs where a respondent has not included product characteristics information in its cost database. *See* Navneet's Brief at 24–28. Navneet, however, fatally misreads the precedent on which it relies, as the Government's Brief cogently explains. *See* Government's Brief at 16–17. Tellingly, that precedent did not involve sold-but-not-produced merchandise or any other issue requiring identification of surrogate costs. *See* Issues and Decision Memorandum accompanying *Ripe Olives from Spain*, 86 Fed. Reg. 35,056 (Dep't Commerce July 1, 2021) (final results of

---

[5] As noted above, Commerce had all the information required to do this. Navneet reported the data in its cost database by CONNUM. Appx81317–81321 and Appx11903–11906 (Navneet's cost database printout). A CONNUM is simply a concatenation of individual product characteristic codes. Appx80701–80704 and Appx11427–11429.

11

antidumping administrative review 2018-2019) at cmt. 1 ("*Ripe Olives from Spain*"). Rather, the issue there was the respondent's failure to report the costs for third-country sales that had the same CONNUMs as its home and/or U.S. sales. *See Ripe Olives from Spain* at cmt. 1. While the case confirms that third-country costs are not inherently irrelevant to Commerce's dumping calculations, the salient issue here is whether, having both third-country CONNUMs and costs on the record, Commerce was required to ignore them because of Navneet's failure to report individual product characteristics fields in its costs database. On this issue, *Ripe Olives from Spain* is inapposite.

That said, apposite precedent supports Commerce's action here. *See* Issues and Decision Memorandum accompanying *Stainless Steel Sheet and Strip in Coils from Mexico*, 76 Fed. Reg. 2,332 (Dep't Commerce Jan. 13, 2011) (final results of antidumping duty administrative review) ("*Stainless Steel Sheet and Strip in Coils from Mexico*") at 4–5. Unlike *Ripe Olives from Spain*, Commerce's findings in *Stainless Steel Sheet and Strip in Coils from Mexico* are specific to the assignment of surrogate costs. Relevantly for the case at bar, Commerce recognized in *Stainless Steel Sheet and Strip in Coils from Mexico* that it was necessary to modify its computer programming to ensure that all cost CONNUMs were included in the surrogate cost CONNUM pool.

> In this instance, Mexinox reported production costs, but there were no corresponding sales of those CONNUMs. In order to maintain consistency with our preference of establishing surrogate costs based on the most similar merchandise, we determine it is necessary to revise our programming language in order to capture the costs of all reported CONNUMs and not simply those that were sold. . . . In order to include these cost CONNUMs into our calculations, we assigned the appropriate, individual product characteristics to those CONNUMs which were not sold and consequently excluded from our program. Therefore, our revised program includes the costs for these CONNUMs, as we find it ensures costs are derived in consideration of all products produced in the {period of review} and results in surrogate costs based on more appropriate similar products.

*Id.* at 5.

According to Navneet, Commerce wrongly overrode Navneet's reporting conditions when it added the product characteristic fields to Navneet's cost database, improperly forcing the "YES" option onto the surrogate cost macro. Navneet's Brief at 19–21. But as *Stainless Steel Sheet and Strip in Coils from Mexico* indicates, Commerce's standard surrogate cost programming relies on product characteristics data. Commerce accordingly instructs respondents to report the product characteristic fields in the cost database. *See, e.g.*, Appx10837. If they comply, the programming conditions necessary to include the surrogate cost macro to "YES" are established, ensuring that all cost CONNUMs are retained. But even if a company fails to report these fields in the cost database, the product characteristics data remains necessary. Where there are cost CONNUMs for which product characteristics cannot simply be pulled from individual fields in the home-market or U.S. sales files, Commerce simply defines, or "reverse engineer{s}," the fields itself. *See* Navneet's Brief at 22; *Stainless Steel Sheet and Strip in Coils from Mexico* at 5.

Even if Commerce had not already spoken to this precise issue in *Stainless Steel Sheet and Strip in Coils from Mexico*, Commerce's reliance on all cost CONNUMs in identifying appropriate surrogate costs here would be not only reasonable, but required. Navneet reported third-country cost data in its cost database. Appx12537. These costs are for products that are extremely similar in physical characteristics, and thus in presumptive cost of production, to Navneet's sold-but-not-produced home-market CONNUMs. *Id.* As such, these third-country products more accurately capture the costs to produce those sold-but-not-produced home market CONNUMs than any other record information would. *See id.* Given that the overarching goal of the agency's calculations is that of producing accurate dumping margins, *Shakeproof*, 268 F.3d at 1382 (quoting *Lasko*, 43 F.3d at 1446), there would have been no basis for the agency to ignore the third-country cost data, or otherwise to depart from reliance on the data that most closely captures the relevant costs.

## V. CONCLUSION

For the reasons discussed above and in the Government's Brief, the AASPS respectfully requests that this Court deny plaintiff's motion for judgment on the agency record.

        Respectfully submitted,

        */s/ Timothy C. Brightbill*
        Timothy C. Brightbill, Esq.
        Maureen E. Thorson, Esq.
        Nicole C. Hager, Esq.

        **WILEY REIN LLP**
        2050 M Street, NW
        Washington, DC 20036
        (202) 719-7000

        *Counsel to Association of American School Paper Suppliers and its individual members*

February 15, 2023

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Association of American School Paper Suppliers and Its Individual Members' Response to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,154 words.

   */s/ Timothy C. Brightbill*
(Signature of Attorney)

   Timothy C. Brightbill
(Name of Attorney)

   Association of American School Paper Suppliers and Its Individual Members
(Representative Of)

   February 15, 2023
(Date)